**WESTERN SELECT PROPERTIES, L.P., Petitioner,**

v.

**STATE BOARD OF TAX COMMISSIONERS, Respondent.**

No. 49T10–9212–TA–00106.

Tax Court of Indiana.

Sept. 9, 1994.

Robert J. Shuckit, Joseph D. Calderon, Jeffrey A. Abrams, Stacy L. Hill, Dann Pecar Newman Talesnick & Kleiman, P.C., Indianapolis, IN, for petitioner.

Pamela Carter, Atty. Gen., Thomas K. Caldwell, Marilyn S. Meighen, Deputy Attys. Gen., for respondent.

FISHER, Judge.

The Petitioner, Western Select Properties, L.P. (Western Select), appeals the final determination of the Respondent, the State Board of Tax Commissioners (the State Board), valuing its property improvements for the 1989 assessment.

## ISSUES

I. Whether the State Board erred in refusing to allow obsolescence adjustments on Buildings 50 and 60.

II. Whether the State Board's award of an obsolescence adjustment on Building 20 is based on ascertainable standards.

III. Whether the State Board assessed Western Select's facility consistently with similar property of the same classification.

## FACTS AND PROCEDURAL HISTORY

Western Select owns property in Warren Township, Marion County, Indiana. The property, formerly the Western Electric manufacturing plant, consists of a lot with six separate buildings (Buildings 20, 30, 40, 41, 50, and 60). Western Select purchased the

property in 1987 and, at the time of the 1989 assessment, rented the buildings to various tenants, most of whom used the buildings as warehouse facilities.

For the 1989 assessment, the Warren Township Assessor (the Assessor) assessed Western Select's property at $4,670,330 ($422,100 for land and $4,248,230 for improvements). This assessment included functional obsolescence adjustments in the amount of 15 percent for Building 50 and 50 percent for Building 60. An economic obsolescence adjustment of 30 percent was awarded to the entire property.

Western Select filed a Form 130 Petition for Review with the Marion County Board of Review (the County Board), alleging the assessment of improvements was erroneous due to improper use classifications and grading, as well as inadequate functional and economic obsolescence adjustments. The County Board reevaluated the assessment and reduced it to $4,639,960 ($422,100 for land and $4,217,860 for improvements). The reduction, however, was based on changes made to the values of certain yard improvements [1] on the property; no changes were made, however, to the obsolescence adjustments previously granted by the Assessor.

On August 14, 1990, Western Select filed a Form 131 Petition for Review with the State Board, alleging that the assessment was still erroneous for the same reasons it stated in its Form 130. The State Board held a hearing on May 11, 1992, at which Western Select presented evidence indicating deficiencies in its buildings that warranted obsolescence adjustment increases. Western Select also provided evidence to show that the obsolescence adjustments awarded to its buildings were inadequate in relation to the obsolescence adjustments awarded to comparable buildings at the Chrysler plant across the street.

On June 16, 1992, State Board hearing officers Edward Bisch and Mike Watkins inspected Western Select's property. Subse-

quently, Bisch prepared and submitted a report to the State Board, recommending the elimination of the functional obsolescence adjustments previously awarded to Buildings 50 and 60. Bisch also recommended the elimination of the economic obsolescence adjustment attributed to the entire property.

In its final determination issued October 30, 1992, the State Board adopted Bisch's recommendations and eliminated the functional obsolescence adjustments on Buildings 50 and 60, as well as the economic obsolescence adjustment on the entire property. This appeal now follows. Additional facts will be provided as necessary.

### STANDARD OF REVIEW

"When acting within the scope of its authority, the State Board is accorded great deference." *Mahan v. State Bd. of Tax Comm'rs* (1993), Ind.Tax, 622 N.E.2d 1058, 1061 (citing *Wirth v. State Bd. of Tax Comm'rs* (1993), Ind.Tax, 613 N.E.2d 874, 876). "Accordingly, the court will reverse the State Board's final determination only when it is unsupported by substantial evidence, constitutes an abuse of discretion, exceeds statutory authority, or is arbitrary or capricious." *Id.*

### DISCUSSION AND DECISION

In Indiana, property is assessed based on its true tax value, not its market value. *Wirth*, 613 N.E.2d at 878 (citing IND.CODE 6–1.1–31–6(c); 6–1.1–31–7(d)). To calculate the true tax value of an improvement, 50 I.A.C. 2.1–5–1 provides the following formula:

REPRODUCTION COST – PHYSICAL DEPRECIATION = VALUE

VALUE – OBSOLESCENCE DEPRECIATION = TRUE TAX VALUE.

"Obsolescence [d]epreciation is composed of functional and economic loss of value." 50 I.A.C. 2.1–5–1. "Functional obsolescence is a form of depreciation resulting in loss of value due to lack of utility or desirability inherent

---

**1.** Yard improvements are "improvements to the property that generally are detached from the principal building[ ] and are recorded and priced separately." 50 I.A.C. 2.1–4–3(g). Western Select's property had a variety of yard improvements: canopy, scale house, loading platform and ramp, storage sheds, pumphouse, guardhouses, steel water storage tank, paving, and fencing.

in the design of the property." *Property Taxation* 114 (Jerrold F. Janata, ed., 2d ed. 1993). There are numerous causes of functional obsolescence:

> Limited use or excessive material and product handling costs caused by irregular or inefficient floor plans, varying floor elevations, inadequate clearance, or cut up interiors with small bays and an excessive number of walls, posts or columns
>
> . . . . .
>
> Excessive or deficient floor load capacity
>
> Insufficient or inadequate elevator service
>
> . . . . .
>
> Inadequate power distribution, heating, ventilating, air conditioning, or lighting systems
>
> Poor ratio of land area to building area
>
> Inadequate parking, truck or railroad loading or unloading facilities

50 I.A.C. 2.1–5–1. Economic obsolescence, on the other hand, is a form of depreciation that results from deficiencies external to the property:

> Causes of Economic Obsolescence: The assessor must make a thorough investigation of the economic background of each individual structure in order to determine the degree of obsolescence which exists.
>
> > Location of structure unappropriate [sic.] for its neighborhood
> >
> > A neighborhood that is in transition of use
> >
> > . . . . .
> >
> > Market acceptability of the product or devices for which the property was constructed or is currently used
> >
> > Termination of the need of the property due to actual or probable changes in economic or social conditions
> >
> > . . . . .

*Id.*

## I

**■** Western Select contends that various deficiencies have rendered Buildings 50

and 60 obsolete as warehouses and, therefore, obsolescence adjustments are necessary to reflect the loss. As the taxpayer, Western Select bears the burden to show that the State Board's determination is inaccurate. *See Paul Heuring Motors, Inc. v. State Bd. of Tax Comm'rs* (1993), Ind.Tax, 620 N.E.2d 39, 41 (citing *Meridian Hills Country Club v. State Bd. of Tax Comm'rs* (1987), Ind.Tax, 512 N.E.2d 911, 913). Consequently, it "must present a prima facie case, or one in which the evidence is 'sufficient to establish a given fact and which if not contradicted will remain sufficient.'" *GTE North Inc. v. State Bd. of Tax Comm'rs* (1994), Ind.Tax, 634 N.E.2d 882, 887 (quoting *Thorntown Telephone Co. v. State Bd. of Tax Comm'rs* (1994), Ind.Tax, 629 N.E.2d 962, 964).

To support its claim for obsolescence, Western Select presented evidence at the State Board hearing on June 16, 1992, showing that Buildings 50 and 60 have low ceilings, inadequate floor load capacities, improper column spacing, nonfunctional elevators and truck docks, and unused mezzanine space. *Petitioner's Exhibits 1, 2, and 3.* Western Select also presented evidence regarding the leases in place in each building, as well as the amount of rent each tenant pays annually. *Petitioner's Exhibit 3.* Furthermore, Western Select showed that Building 50 was 28 percent vacant on the date of assessment and Building 60 was 85 percent vacant on the date of assessment. *Petitioner's Exhibit 2.* Finally, Western Select presented evidence that the State Board awarded the Chrysler facility a 60 percent overall obsolescence adjustment, while Western Select's overall obsolescence adjustment was reduced from 30 percent to zero percent.[2] *Petitioner's Exhibit 1.*

**■** Although Western Select's burden of proof does not shift, the duty of going forward with evidence may shift several times.

---

2. Western Select's Form 131 petition made reference to "overall obsolescence" adjustments given to both its facility and the Chrysler facility. *Petitioner's Exhibit 1.* Western Select later admitted at oral argument, however, that the State Board's regulations do not define or provide for

"overall obsolescence." *Transcript of Oral Argument* at 17. Based on the adjustment figures themselves, the court believes Western Select was actually comparing the economic obsolescence adjustments given to the two facilities.

*See GTE North,* 634 N.E.2d at 887 (citing *Thorntown,* 629 N.E.2d at 964). Thus, once Western Select presented its prima facie case, it was incumbent on the State Board to rebut Western Select's evidence. The State Board, however, did not. Instead, it rejected the evidence, claiming that its method of valuation already accounted for any deficiencies present in Buildings 50 and 60.

More specifically, the State Board asserts that because it valued the buildings based on their actual or current use as warehouses, and not on their original intended use as manufacturing facilities, only normal deficiencies exist. Bisch explained at trial that "normal deficiencies would be included in the normal depreciation ... [and] abnormal deficiencies would be valued at—or considered a loss to value by using the obsolescence depreciation on top of the physical depreciation." *Transcript* at 88, 90. In other words, the State Board argues that normal obsolescence deficiencies are accounted for by physical depreciation, and abnormal obsolescence deficiencies are accounted for by obsolescence depreciation. The State Board is mistaken.

■ First, physical depreciation is defined as "the impairment of condition as a result of wear and tear and disintegration." 50 I.A.C. 2.1–5–1. "Physical depreciation is a combination of age and condition." *Id.* There is no mention in that definition, however, of "excessive or deficient floor load capacity," "inadequate power distribution ...," "market acceptability ... for which the property ... is currently being used," or other factors considered in awarding obsolescence adjustments. Indeed, comparing physical depreciation to obsolescence depreciation is like comparing apples to oranges—they are two entirely different things. For instance, a just-built building will not suffer from any physical depreciation, yet it can suffer from obsolescence depreciation, as perhaps the floor load capacity is inadequate for the building's purpose. Consequently, physical depreciation does not account for obsolescence depreciation.

Second, as 50 I.A.C. 2.1–5–1 points out, a variety of deficiencies is considered in determining whether obsolescence exists. Despite Western Select's evidence relating to the functional and economic deficiencies present in Buildings 50 and 60, the State Board did not award any obsolescence adjustments because those "deficiencies ... are all normal deficiencies which would be expected when changing the use of a building formerly designed as a single user manufacturing facility into a multiple user warehouse facility." *Respondent's Post–Trial Brief* at 8–9. The State Board further claims that the language in 50 I.A.C. 2.1–5–1 implies that adjustments are given for abnormal losses and deficiencies only: "[t]he regulation requires the loss or deficiency to be greater than normal by defining the causes of obsolescence with words such as poor, inadequate, excessive, insufficient, and inoperative." *Respondent's Post Trial Brief* at 6.

The State Board's regulations define "normal obsolescence" as "the anticipated or expected reduction in the value of *business personal property* that can be foreseen by a reasonable, prudent businessman when property is acquired and placed into service." 50 I.A.C. 4.2–9–2 (emphasis added). "Abnormal obsolescence" is defined as:

> that obsolescence which occurs as a result of factors over which the taxpayer has no control and is unanticipated, unexpected, and cannot reasonably be foreseen by a prudent businessman prior to the occurrence. It is of a nonrecurring nature and includes unforeseen changes in market values, exceptional technological obsolescence, or destruction by catastrophe that has a direct effect upon the value of the *personal property* of the taxpayer at the tax situs in question on a going concern basis.

50 I.A.C. 4.2–9–3(a) (emphasis added). Thus, the distinction between "normal" and "abnormal" obsolescence is explained and defined within the context of personal property. Indeed, the State Board's regulations provide "abnormal obsolescence" adjustments for depreciable business personal property and inventory only. 50 I.A.C. 4.2–4–8; 50 I.A.C. 4.2–5–14. *See also Harbor Food Plaza, Inc. v. State Bd. of Tax Comm'rs* (1994), Ind.Tax, 638 N.E.2d 898, 898.

The State Board regulations regarding real property assessment, however, are silent

with respect to adjustments for "abnormal" obsolescence. Nevertheless, the State Board argues that although 50 I.A.C. 2.1–5–1 does not distinguish on its face between "abnormal" and "normal" obsolescence, the distinction has been made with respect to personal property. "Logic dictates," the State Board continues, that the same distinction and analysis also apply to real property. *Respondent's Post–Trial Brief* at 7–8.

■ State Board regulations "ha[ve] the force of law," *C & C Oil Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 570 N.E.2d 1376, 1381 (citing *Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 586, *aff'd* (1992), Ind., 585 N.E.2d 1336), and are therefore subject to the same rules of construction as statutes. *Johnson County,* 568 N.E.2d at 586 (citing *Rogers v. State Bd. of Tax Comm'rs* (1991), Ind.Tax, 565 N.E.2d 398, 402). Consequently, one of the primary rules of regulatory construction is that the court must determine the true intent of the enacting body. *See Shoup Buses, Inc. v. Indiana Dep't of State Revenue* (1994), Ind. Tax, 635 N.E.2d 1165, 1168. "To accomplish this, the court gives [regulatory] words and phrases their plain, ordinary, and usual meaning ..." *Id.* (citing *Knauf Fiber Glass, GmbH v. State Bd. of Tax Comm'rs* (1994), Ind.Tax, 629 N.E.2d 959, 961).

■ Real property and personal property are two separate types of property. As a result, the State Board has separate bodies of regulations for each. *See* 50 I.A.C. 2.1–1–3 and 50 I.A.C. 4.2–4–10. The State Board's definition of personal property excludes the word "improvement." 50 I.A.C. 4.2–1–1(h). Moreover, the distinction between "normal" and "abnormal" obsolescence is made with respect to personal property only. *See Harbor Food,* 638 N.E.2d at 898. Because 50 I.A.C. 2.1–5–1, the State Board regulation governing real property, makes no distinction between "normal" and "abnormal" obsolescence, the court will not add or substitute those words. *See State v. Springer* (1992), Ind.App., 585 N.E.2d 27, 29 (citing *Herbert v. State* (1985), Ind.App. 484 N.E.2d 68, 70) *trans. denied.* Simply put, a deficiency is a deficiency—there is no distinction between a normal deficiency and an abnormal deficiency for purposes of real property obsolescence depreciation. Accordingly, the State Board's distinction between normal and abnormal deficiencies in this case is arbitrary and capricious.

## II

■ In the same assessment, the State Board determined that Western Select's Building 20 was "totally vacated and in a defunct state." *Petitioner's Exhibit 7.* The building, however, received only a 75 percent obsolescence adjustment. At trial, Bisch explained his reasoning:

Q: "Is 75 percent as high as you feel you can go on obsolescence?"

A: "No."

Q: "Okay. Well, can you tell me how you can get more obsolete than being totally vacant and defunct?"

A: "That's hard to answer."

Q: "Sounds like 100 percent; doesn't it?"

A: "No, it doesn't provide for 100 percent. The regulation provides for five percent to 95 percent."

Q: "Right. It's closer than 95—to 95 than 75 when it's totally vacant and defunct; isn't it?"

A: "It may be. As I stated earlier, it's subjective."

Q: "You don't really have any basis for saying it's 75 versus 95; right?"

A: "No."

*Transcript* at 70–71 (footnote added).

■ The court recognizes that many State Board determinations require an assessor's subjective judgment. Consequently, the State Board is given a great deal of discretion in making those determinations. *See Hatcher v. State Bd. of Tax Comm'rs* (1990), Ind.Tax, 561 N.E.2d 852, 857. Nevertheless, the State Board must provide some reasoning to support its determination. *See Harrington v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 525 N.E.2d 360, 361. In the case at bar, when offered the opportunity, the State Board did not and could not explain its rationale for awarding Building 20, which was totally vacant and defunct, a 75 percent obso-

lescence adjustment rather than a 95 percent obsolescence adjustment. Accordingly, the State Board's determination is unsupported by any evidence at all, and is therefore arbitrary and capricious.

## III

■ Finally, Western Select contends that its facility should be assessed consistently with similar property of the same classification, particularly the Chrysler facility across the street. To support its claim, Western Select, when it filed its Form 131 with the State Board, submitted a comparison of its facility with the Chrysler facility. *Petitioner's Exhibit 1*. Specifically, Western Select presented detailed evidence that the characteristics, features, and location of the two facilities were similar. *Petitioner's Exhibit 1*. Consequently, Western Select maintains the obsolescence adjustments awarded to the two facilities should be similar as well. Nevertheless, Chrysler's improvements received a 60 percent overall obsolescence adjustment, and Western Select's overall obsolescence adjustment was reduced from 30 percent to zero percent.[3]

At the State Board hearing, Bisch assured Western Select that he would conduct a side-by-side comparison of the two facilities, as he would be assessing them at the same time. *Transcript* at 25. Accordingly, Western Select did not submit Chrysler's property record card to Bisch. Later, however, the State Board determined that it would not adjust Western Select's assessment to reflect its similarity with Chrysler because Western Select "submitted [the evidence of Chrysler's comparability] without written documentation [i.e. the underlying property record cards] to prove or support [its] contentions of difference to the subject property under appeal." *Petitioner's Exhibit 7*.

■ ■ Western Select bears the burden to show that its assessment is inconsistent with Chrysler's assessment. *See Paul Heuring*, 620 N.E.2d at 41 (citing *Meridian Hills*, 512 N.E.2d at 913). Consequently, it must present a prima facie case showing that the two assessments are indeed inconsistent. *See GTE North*, 634 N.E.2d at 887 (quoting

*Thorntown*, 629 N.E.2d at 964). The comparison Western Select submitted to the State Board sufficiently indicated that two facilities were indeed similar and that the State Board had improperly graded and denied obsolescence adjustments to Western Select's buildings in relation to Chrysler's buildings. Consequently, Western Select presented its prima facie case.

■ Once Western Select made its prima facie showing that the two assessments were inconsistent, it was incumbent on the State Board to rebut Western Select's evidence. *See id.* Instead, the State Board simply rejected the evidence because Western Select did not submit Chrysler's property record card. This is not a sufficient rebuttal, particularly in light of the fact that Bisch assured Western Select that he would do a side-by-side comparison of the two facilities. Moreover, because Bisch assessed the two properties at the same time, he already had Chrysler's property card.

Furthermore, when the State Board valued Western Select's other parcels for the same 1989 assessment, it received, and used, underlying documentation on comparable properties from someone other than Western Select. For instance, while assessing Western Select parcel # 7015971, the State Board received a property record card for a comparable property from the Assessor. *Transcript* at 35. Likewise, in his notes from the State Board hearing, Bisch reminded himself to compare Western Select's Building 20 with an office building at the nearby Lilly facility. *Petitioner's Exhibit 4* at 2. Again, this was not documentation provided by Western Select. *Transcript* at 37. Indeed, Bisch testified at trial:

Q: "So you could go to the township assessor's deputy and get documents that you needed to review; right?"

A: "If I felt I needed it, yes."

Q: "Including all the comps and underlying documentation on Chrysler; right?"

A: "I could have done that, yes."

Q: "Now, that would have helped; wouldn't it?"

---

**3.** See n. 3, supra.

A: "No, I don't know if it would or wouldn't. But I suppose it would."

*Transcript* at 61.

 It is the State Board's duty to assess similar properties consistently. *Bielski v. Zorn* (1994), Ind.Tax, 627 N.E.2d 880, 885. This is not to say that Western Select, as the taxpayer, has no duty at all: it must present some evidence of probative value to support its claim that its property has been assessed inconsistently with similar properties. *See GTE North,* 634 N.E.2d at 887. Once Western Select did present that evidence, however, the State Board could not simply refuse to recognize it. Instead, it had to show why the evidence did not support Western Select's claim for uniform assessment. Because the State Board failed to do so, the court is compelled to find that the State Board's determination on this issue is arbitrary and capricious.

### CONCLUSION

The State Board's determination is both unsupported by substantial evidence, as well as arbitrary and capricious. Accordingly, the assessment is REVERSED and REMANDED to the State Board for reassessment consistent with this opinion.