Wanda C. COREY and J. William
Corey, Petitioners,

v.

STATE BOARD OF TAX
COMMISSIONERS,
Respondent.

No. 49T10–9209–TA–00071.

Tax Court of Indiana.

Jan. 7, 1997.

Frank N. Howard, Crawfordsville, for Petitioner.

Pamela Carter, Attorney General, Ted J. Holaday, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

Wanda and J. William Corey appeal the final determination of the State Board of Tax Commissioners assessing their residential land for the March 1, 1989 assessment date. Though the issues originally raised by the petitioners were legion, these have been rendered down to six:

I. Whether the State Board properly classified the Coreys' land.

II. Whether the State Board correctly calculated the square footage of the Coreys' residence.

III. Whether the State Board applied the proper grade to the Coreys' residence.

IV. Whether the State Board determined the proper condition of the Coreys' residence.

V. Whether the State Board assessed the Coreys' tennis court correctly.

VI. Whether the State Board properly considered a nearby hog-raising operation in its assessed valuation of the Coreys' property.

### FACTS AND PROCEDURAL HISTORY

The Coreys own 23.72 acres of land and improvements in Montgomery County about four miles from Crawfordsville. The property is on the north side of Indiana Highway 32, one mile east of the junction of Highway 32 and Interstate 74. In addition to the Coreys' home, the property includes an outbuilding, a swimming pool, and a tennis court.

In 1989, the State Board assessed the Coreys' property, and the Coreys appealed to this Court. Their appeal was based on many contentions, including a disagreement about neighborhood and land classification, measurement calculations, and various problems relating to the assessment of their improvements. While the appeal was pending, the parties jointly requested that the cause be remanded to the State Board for reassessment. This Court obliged. On remand, Kenneth Daly was appointed as hearing officer, and a hearing on the reassessment was held on September 20, 1994.

At the hearing, the Coreys' basic claim was "that after [they] built the house there was a hog operation built across the highway from [them], and there [was] no way in which [they could] utilize the property ... as intended." Tr., vol. I, at 22. More specifically, Mr. Corey claimed that on certain days the stench coming from the hog operation prevented them from enjoying their property. He claimed they could not entertain outdoors, hang laundry outside to dry, use the tennis court or swimming pool, or leave the windows open. Two jars, which Mr. Corey stated contained air samples taken in his front yard, were presented to the hearing officer as evidence in support of this claim.

At the conclusion of the hearing, Hearing Officer Daly drove to the Coreys' residence to view the property.[1] Daly took measurements and inspected the property. He detected no odor during the one and a half hours he spent at the Coreys' home. After leaving the property, Daly drove to the hog facility. While not getting out of his car or going onto the facility property, he did drive close to the facility. He did not smell any odor at that time. This was Daly's only visit

---

1. Rancor and acrimony extend from this inspection by Hearing Officer Daly. Mr. Corey took great umbrage from the fact that Mr. Daly disturbed his wife with an inspection visit following the hearing. Mr. Corey had indicated some unwillingness to have Mr. Daly inspect his property after the hearing due to 1) the fact they had just entertained out-of-town guests, and/or 2) the fact that his wife was ill. The two separated with a different understanding as to when and if an inspection would take place. Mr. Daly drove to the Coreys' house immediately following the hearing, while Mr. Corey did not. Eventually, Mrs. Corey arrived. Mr. Daly did not inspect the interior of the house due to Mrs. Corey's reluctance to let him do so without her husband present. Tr., vol. I, at 103–108. Following his visit, Mr. Daly requested that he be allowed to return to inspect the interior of the house. These requests were met with only bitter and uncooperative responses.

to the Coreys' property and to the hog facility.

Board's findings in regards to the established land value.

## STANDARD OF REVIEW

■ "The State Board is accorded great deference when acting within the scope of its authority." *Wirth v. State Bd. of Tax Comm'rs,* 613 N.E.2d 874, 876 (Ind. Tax Ct.1993). The Court will reverse the State Board's final determination only when it is unsupported by substantial evidence, constitutes an abuse of discretion, exceeds statutory authority, or is arbitrary and capricious. *Id.*

## DISCUSSION AND ANALYSIS

### I. Land Value

■ The Coreys contend that the State Board placed too high a value on their land because most of it is impossible to farm. Specifically, the Coreys claim that the State Board has categorized certain portions of their property as non-tillable land when it should be considered woodland. Under the regulations, both non-tillable and woodland type land classifications receive deductions. IND. ADMIN. CODE tit. 50, § 2.1–2–2 (1992) (repealed). The woodland deduction—an 80% reduction in value—is applicable to land that has 50% or more canopy cover. The non-tillable deduction—a 60% reduction in value—is given to land that is brush-covered with less than a 50% canopy or natural impediments that deter crop production.

■ Although portions of the Coreys' land were classified as woodland, they offered no evidence that additional portions of their land met the requirements to be classified as such. The undisputed evidence showed that the additional areas that the Coreys sought to have changed from a 60% to 80% deduction had an insufficient canopy to qualify as woodland. Tr., vol. II, at 8–9. Where a taxpayer fails to meet the burden of proof that the State Board's assessment was inaccurate, the assessment must be sustained. *See Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890, 893 (Ind. Tax Ct.1995) (citing *Mahan v. State Bd. of Tax Comm'rs,* 622 N.E.2d 1058, 1064 (Ind. Tax Ct.1993)). Accordingly, this Court affirms the State

### II. Square Footage

■ The Coreys contend that the square footage used to determine the assessment for their residence was incorrect. The State Board assessed the property based on the hearing officer's measurements of 2592 square feet. Hearing Officer Daly measured the residence, and double checked his work, using a tape measure. Tr., vol. II, at 16. He rounded his measurements to the nearest foot. Tr., vol. II, at 19. The Coreys claim that the residence is only 2560 square feet, though they never specified any measurement that was wrong. They note that the overall length of the residence should be 82 feet, while the Daly's measurements add up to 83 feet. Mr. Corey conceded that this difference in numbers might reflect the rounding of the measurements. Tr., vol. I, at 64–67. Mr. Corey admitted that he did not measure the house himself. Tr., vol. I, at 66.

The Coreys have not met the burden of proof necessary for this Court to set aside the State Board's determination on this issue. Daly's measurements, including the rounding of figures, were not an abuse of discretion. The Court finds that the State Board's determination of the square footage has a demonstrated basis in fact and is therefore affirmed.

### III. Residence Grade

The Coreys also contend that their residence has been assessed at the wrong grade—B+1. Mr. Corey testified that the grade should be lowered to C+1 because comparable homes in the area were graded as such. Tr., vol. I, at 44–45. However, the Coreys failed to present any evidence of the grades assigned to other area houses either at the administrative hearing or at trial before this Court.

■ The regulations are clear that building grade determinations require "careful consideration and sound judgment on the part of the assessor." IND. ADMIN. CODE tit. 50, § 2.1–4–3(f) (1992) (repealed). The assessor is to make adjustments "to account for

variations in the quality of materials, workmanship, and design." *Id.* The determination is based upon many specific features that are particular to the building in question. Here, the Coreys have failed to offer any evidence of the features of their residence that indicate that it was improperly graded. Furthermore, the grade determination was made primarily from the exterior. This was due to the fact that the hearing officer was not allowed inside to make observations. In such circumstances taxpayers have no legitimate complaint that some other features might justify a lower grade. Taxpayers can not claim error in an assessment due to their own actions. *State Bd. of Tax Comm'rs v. South Shore Marina,* 422 N.E.2d 723, 730 (Ind.Ct.App.1981).

Daly identified particular features he observed from the outside that supported his determination of a B+1 grade. These included architectural elements, roof lines, windows, brick- and woodwork. Tr., vol. II, at 21–22. The Coreys did not dispute this testimony. These observations provide a basis for the State Board's determination of a B+1 grade. The State Board's determination is affirmed.

## IV. Residence Condition

The Coreys also challenge the State Board's rating of the condition of their residence. On this issue, however, the Coreys and the State Board agree. The condition of a residence is determined according to regulations provided by IND. ADMIN. CODE tit. 50, § 2.1–5–1 (1992) (repealed). Condition is a judgment of the physical state of the item relative to its age. Together with neighborhood desirability and age, it is a factor used in calculating the depreciation of a residence. As such, it also has an effect on the assessed value. The Coreys claim the condition of their residence is only average. The hearing officer and the State Board agree that the residence is only in average condition, and it was considered as such in the assessment. Tr., vol. II, at 25. This determination is also reflected on the property record card. For these reasons, the State Board's determination is affirmed.

## V. Tennis Court

The Coreys also assert that their tennis court was improperly assessed at 60 × 120 feet when it should have been assessed at 60 × 112 feet. The evidence at trial established that Mr. Corey had never previously mentioned that the tennis court was smaller than standard size. Instead, he claimed that depreciation of 40% should be allowed. This is what the State Board had allowed. Tr., vol. II, at 32. Mr. Corey's testimony that 30% depreciation was given is in conflict with both that testimony and with the property record card. The property record card reflects the 40% depreciation. Ex. 4–1. The Coreys obtained the adjustment they sought for their tennis court. The 40% depreciation on the tennis court is affirmed.

## VI. Desirability Rating

█ Finally, the Coreys assert that the State Board, in their assessment of the Coreys' residential property, did not properly consider the negative effect a nearby hog facility had on their neighborhood. On the other hand, the State Board contends that the neighborhood desirability rating of "average" adequately describes the Coreys' neighborhood.

█ Under the State Board's regulations, neighborhood desirability constitutes "a composite judgment of the overall desirability based on the condition of agreeable living and the extent of residential benefits arising from the location of the dwelling." IND. ADMIN. CODE tit. 50, § 2.1–3–3(m) (1992) (repealed). Accordingly, an evaluation of neighborhood desirability looks beyond the improvement itself to external features of the property's location that may affect its value. The rating level describes the balance between desirable and undesirable factors in the improvement's location. For example, the regulations explain that "[t]he Average Neighborhood is neither particularly attractive nor unattractive; having some characteristics which make it attractive and desirable, but offset by some that make it undesirable." IND. ADMIN. CODE tit. 50, § 2.1–5–1 (1992) (repealed).

The Coreys bear the burden of proving that the neighborhood desirability rating is

incorrect. *Herb,* 656 N.E.2d at 893. They have met this burden. Mr. Corey provided the hearing officer with two jars, redolent with swine. Tr., vol. I, at 101. While these jars remained unopened, Mr. Daly conceded at trial that they would have smelled bad had they been opened. *Id.* at 102. Mr. Corey also gave verbal evidence as to how the stench made it impossible for the Coreys to enjoy their property. *Id.* Mr. Corey testified that, on days when the ill wind blew, they could not use their pool or tennis court, hang clothes outside to dry, or open the windows of the house to enjoy fresh air. On days when the air was particularly miasmic, the Coreys claim they were required to retreat to the center of their house. Tr., vol. I, at 27–30.

In meeting their burden of proof, the Coreys placed the burden of going forward on the State Board to show that the determination was correct. While the determination of neighborhood desirability is largely a qualitative one, such a judgment still must be supported by substantial evidence. In this case, the State Board based its rating on the hearing officer's testimony that on the day he visited the area he did not notice a strong smell coming from the hog facility. This is not at all inconsistent, however, with the Coreys' assertion that their property becomes almost unlivable when the merdurinous odor from the hog farm does waft over to their property. In the absence of evidence contradicting the the Coreys' claim, this Court finds that the State Board's rating is arbitrary and capricious and unsupported by substantial evidence.

In their brief, the State Board claims that "[i]t would be an unreasonable burden" to have the hearing officer make various trips to the property in order to "obtain relevant observations on the smell." Resp. Br. at 11. The Court does not agree with this characterization. The Court is merely requiring the State Board to gather evidence in Montgomery County, not mount an expedition into the heart of darkness. Furthermore, the Court is not directing the State Board in how it is to make its determination—an olfactory investigation by a hearing officer is not the only way to determine the hog facility's impact on the neighborhood. Regardless of how the investigation is made, merely spending one and a half hours at the Coreys' property, then driving a car near the hog facility with proboscis protruding, does not approach the level of investigation necessary to support the "composite judgment" required by IND. ADMIN. CODE tit. 50, § 2.1–5–1.

 "The court cannot properly review a determination unless it is apprised of the basis for the determination." *Bailey Seed Farms, Inc. v. State Bd. of Tax Comm'rs,* 542 N.E.2d 1389, 1392 (Ind. Tax Ct.1989). Furthermore, the Court must be able to determine from the record whether the assessed value was properly calculated. *See Harrington v. State Bd. of Tax Comm'rs,* 525 N.E.2d 360, 363 (Ind. Tax Ct.1988). Since the only evidence before the Court is inconsistent with the "average" neighborhood desirability rating, the Court finds the State Board's assessment is not supported by substantial evidence and is arbitrary and capricious.

### *CONCLUSION*

For the reasons stated above, the State Board's assessment is REVERSED and REMANDED for further consideration consistent with this opinion on the sole issue of the neighborhood's desirability rating.[2] In all other respects and as to all other issues, the State Board's assessment is AFFIRMED.

---

**2.** The Court takes a dim view of the lack of cooperation exhibited by the parties in this matter and is confident that this will improve on remand.