**CANAL SQUARE LIMITED PARTNERSHIP,**
Petitioner,

v.

**STATE BOARD OF TAX COMMISSIONERS,**
Respondent.

No. 49T10–9608–TA–00095.

Tax Court of Indiana.

April 24, 1998.

Larry J. Stroble and John T. Bailey, Barnes & Thornburg, Indianapolis, for petitioner.

Jeffrey A. Modisett, Attorney General, Angela L. Mansfield, Deputy Attorney General, Indianapolis, for respondent.

FISHER, Judge.

Canal Square Limited Partnership (Canal Square) appeals the final determination of the State Board of Tax Commissioners (State Board) assessing its property as of the March 1, 1992 assessment date. Canal Square presents two issues to the Court in its original tax appeal:

I. Whether the State Board rebutted Canal Square's prima facie case establishing the proper amount of obsolescence to be considered in valuing its property.

II. Whether the State Board must value Petitioner's land pursuant to that part of the Marion County Land Valuation Order that establishes values for apartment land.

### Facts and Procedural History

Canal Square is an Indiana partnership with its principal place of business in Carmel, Indiana. Canal Square owns a parcel of land located in Center Township, Marion County, Indiana. The parcel is improved with an apartment complex known as the Canal Square Apartments (the Apartments). The Apartments are situated on land bounded by Vermont Street to the North, by New York Street to the South, the Indianapolis canal to the East, and West Street to the West.

On March 1, 1991, the Apartments were assessed as new construction. Canal Square filed a Form 134 Petition for Real Estate Reassessment[1] with the State Board on March 25, 1992, requesting a reassessment as of March 1, 1992 (the Assessment Date). This petition was granted, and the Center Township Assessor issued a notice reassessing the property at $46,470 for the land and $4,639,530 for the improvements, resulting in a total assessed value of $4,686,000. On November 4, 1992, Canal Square filed a Form 130 Petition for Review of Assessment with the Marion County Board of Review (BOR). The BOR issued its assessment determination on June 25, 1993. This determination corrected the valuation of the plumbing and fixed the assessed value of the Apartments as of the assessment date at $46,470 for the land, and $4,587,530 for the improvements, resulting in a total assessed value of $4,634,000. Canal Square appealed the BOR's determination to the State Board on July 21, 1993, in a Form 131 Petition for Review of Assessment.

On February 28, 1996, a hearing was held by Ernest Clark, the State Board's Hearing Officer, concerning Canal Square's appeal of

1. The Form 134 method of review was repealed effective January 1, 1994. *See Bender v. State* *Bd. of Tax Comm'rs*, 676 N.E.2d 1113, 1114 n. 1 (Ind.Tax Ct.1997).

the assessment of the Apartments. On March 12, 1996, a supplemental hearing and walk-through of the Apartments was conducted by the State Board's Hearing Officer. The State Board issued its Final Assessment Determination on July 3, 1996, fixing the total assessed value of Canal Square's property at $3,786,830 as of the Assessment Date ($464,630 assessed value for the land and $3,322,200 assessed value for the improvements).

At the administrative hearing, Canal Square introduced the testimony of an expert witness, Thomas J. Kaliker, an appraiser certified as a Member of the Appraisal Institute (MAI). Mr. Kaliker testified that the definitions of functional and economic obsolescence in the State Board's regulations (the Assessment Manual) are identical to the definitions of functional and economic obsolescence used by appraisers in arriving at market value. The State Board's Hearing Officer testified in agreement with this proposition and acknowledged that the source of the definition of obsolescence in the Assessment Manual is a book published by the American Institute of Real Estate Appraisers. (Stipulation Exhibit 3, p. 9; Kaliker Testimony, Tr. at 31; Clark Testimony, Tr. at 48).

At the hearing, Canal Square introduced an appraisal study prepared by Mr. Kaliker that quantified the functional and economic obsolescence applicable to the property using recognized appraisal principles. (Stipulation Exhibit 3, p. 6; Kaliker Testimony, Tr. at 21–23, 30.). Mr. Kaliker identified several sources of obsolescence including the excessively narrow floor plan of certain rental units, an electrical substation on site, and the superadequate construction required by the City of Indianapolis.[2] (Stipulation Exhibit 2–C, p. VI–50 through VI–52—Exhibit 3, p. 8–10; Kaliker Testimony, Tr. at 25–31). Mr. Kaliker concluded that the functional and economic obsolescence affecting the Apartments equaled 34.35% of the estimated replacement cost of the property (after physical depreciation). (Stipulation Exhibit 2–C, p. VI–52; Kaliker Testimony, Tr. at 23, 30).

In contrast, the State Board did not prepare any calculations or studies quantifying the amount of obsolescence affecting the Apartments. (Clark Testimony, Tr. at 45–46). Nor did the State board provide any written finding in the administrative record that Canal Square's quantification of the obsolescence at 34.35% was incorrect. Instead, the State Board allowed an obsolescence adjustment of 10%. At trial, the only evidence identified by the State Board in support of the 10% figure was the opinion of its Hearing Officer. (Stipulation Exhibit 3; Clark Testimony, Tr. at 45–46).

The valuation of Canal Square's land was not an issue raised by either Canal Square or the State Board at the administrative hearing or at the supplemental hearing and walkthrough of the Apartments. (Stipulation, para. 11 and Exhibit 3). The State Board's Final Assessment Determination issued July 3, 1996, however, increased the value of the Canal Square land from $1 per square foot to $10 per square foot—a value in excess of the Apartment Land Schedule on page 2 of the Marion County Land Valuation Order. (Stipulation Exhibits 3 and 4). In instances other than the valuation of the Canal Square land, the Center Township Assessor has valued land improved with apartments using the Apartment Land Schedule on page 2 of the Marion County Land Valuation Order. (Stipulation Exhibits 6, 7 and 8). In addition, the Assessors of Pike, Warren, and Washington Townships in Marion County have valued land improved with apartments using the Apartment Land Schedule on page 2 of the Marion County Land Valuation Order. (Stipulation Exhibits 11–12, 14, and 16–17). *See Indianapolis Historic Partners v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1224 (Ind.Tax Ct.1998) (discussing Land Order in detail).

This case was tried before the Court on July 21, 1997, with the filing of a First Stipulation of Facts (the Stipulation) and the presentation of testimony of Thomas J. Kaliker and Ernest Clark. At trial, the Court admitted the Stipulation, Petitioner's Exhibits 1 through 5, and Respondent's Exhibit A. (Tr.

---

**2.** These sources are noted in the State Board's regulations. *See* IND.ADMIN.CODE tit. 50, r. 2.1–5–1 (1992) (recodified in present form at *id.* r. 2.2–10–7(e) (1996)) and discussion *infra*.

at 12, 14). The Court also admitted Exhibits 6 through 17 regarding the land valuation issue. (Tr. at 14).

### Standard of Review

 The State Board is charged with the responsibility of interpreting the property tax laws and ensuring that property assessments are made in the manner prescribed by law. *See Zakutansky v. State Bd. of Tax Comm'rs*, 691 N.E.2d 1365, 1367 (Ind. Tax Ct.1997). This Court has recognized that the State Board must be given a great deal of discretion in carrying out these responsibilities. Consequently, the party challenging an assessment bears the burden of demonstrating that the assessment is unsupported by substantial evidence, constitutes an abuse of discretion, exceeds the State Board's statutory authority, or is arbitrary or capricious. *Vonnegut v. State Bd. of Tax Comm'rs*, 672 N.E.2d 87, 89 (Ind.Tax Ct.1996), *review denied.*

### Discussion and Analysis

### I. Canal Square's Prima Facie Case of Obsolescence

### Taxpayer's Prima Facie Case Will Prevail If the State Board Fails To Rebut It

This Court's decisions have articulated the standards that apply in evaluating a taxpayer's claim that its property tax values are negatively affected by obsolescence.

 In *Thorntown Telephone Co. v. State Board of Tax Commissioners*, 588 N.E.2d 613 (Ind.Tax Ct.1992) (*Thorntown I*) and *Thorntown Telephone Co. v. State Board of Tax Commissioners*, 629 N.E.2d 962 (Ind. Tax Ct.1994) (*Thorntown II*) (together the *Thorntown* cases), the taxpayer challenged the State Board's final determination denying an obsolescence adjustment for the taxpayer's property. This Court stated that when a taxpayer appeals the State Board's determination of obsolescence, it bears the burden of showing that the State Board's assessment is inaccurate. *Thorntown II*, 629 N.E.2d at 964. This burden can be met when the taxpayer presents a prima facie case in support of its position. *Id.* The

Court defined a prima facie case as one which presents "such evidence as is sufficient to establish a given fact and which if not contradicted will remain sufficient." *Id.* (quoting *Plough v. Farmers State Bank*, 437 N.E.2d 471, 475 (Ind.Ct.App.1982)); *see also Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1233–1235 (Ind.Tax Ct. 1998). The taxpayer in the *Thorntown* cases presented, among other things, "studies and statistics on costs of reproduction less depreciation [and] capitalization of income" that quantified the obsolescence it was contending should be applied to its property. 629 N.E.2d at 964. The Court recognized these studies as establishing a prima facie case of obsolescence. *Id.* at 964–65.

Given that the taxpayer had established its prima facie case in *Thorntown II* the Court stated that "it was incumbent upon the State Board to rebut the [taxpayer's] evidence." *Id.* at 965. The Court found that the State Board had failed to do so. Instead, the State Board refused to consider the studies based on the unsupported assertion that "they resulted in 'wide-spread and unexplained differences' " and the fact that they were prepared by the taxpayer. *Id.* The Court dismissed both bases for the State Board's refusal to consider the taxpayer's studies, stating that "unsupported conclusions or findings are insufficient to contradict a prima facie case." *Id.* As the Court stated, "[t]he complexity involved … makes it imperative that the State Board supply authoritative explanation and evidence" to support its quantification of obsolescence. 629 N.E.2d at 966. In circumstances in which the State Board fails to

> show how or why its method of depreciation accounts for economic obsolescence, the court must find that the State Board has not presented evidence sufficient to rebut the [taxpayer's] prima facie case and that its … assessment of the [taxpayer's] property is unsupported by substantial evidence.

*Id.; see also Clark*, 694 N.E.2d at 1235 (State Board may not simply refuse to consider taxpayer's evidence).

In *GTE N. Inc. v. State Bd. of Tax Comm'rs*, 634 N.E.2d 882 (Ind.Tax Ct.1994),

this Court again applied the procedural requirement that the State Board present evidence sufficient to rebut a taxpayer's prima facie case establishing obsolescence. In that case the taxpayer introduced "income shortfall" analyses and "blue chip" studies to quantify the obsolescence affecting its property. The Court held that these analyses and studies established a prima facie case of obsolescence. The State Board did not rebut such studies. Instead, it simply rejected them, contending that they were "unreliable and unverified." 634 N.E.2d at 887. However, the State Board failed to make any findings establishing that the studies were either unreliable or unverified. "Findings entered by an administrative agency must be sufficient to inform the parties of the evidentiary bases upon which the ultimate findings rest...." 634 N.E.2d at 888, (quoting *Thorntown II*, 629 N.E.2d at 965 (quoting *Hale v. Review Bd. of Ind. Employment Security Div.*, 454 N.E.2d 882, 885 (Ind.Ct. App.1983))). Because the State Board failed to rebut the taxpayer's prima facie case, the Court reversed the State Board's decision denying the taxpayer's claim for obsolescence.

In *Western Select Properties v. State Bd. of Tax Comm'rs*, 639 N.E.2d 1068 (Ind.Tax Ct.1994), the Court further examined the scope of the State Board's burden to rebut a prima facie case established by a taxpayer. In *Western Select*, one of the taxpayer's buildings was totally vacant and in a "defunct" state. The State Board awarded it a 75% obsolescence adjustment. However, the State Board could not explain why such a building, which was totally vacant and defunct, should not receive obsolescence depreciation in the amount of 95%. Instead, the State Board's hearing officer stated that he relied on his subjective judgment in recommending 75% obsolescence. 639 N.E.2d at 1073. The Court held that the State Board "must provide some reasoning to support its determination." In this case, however, its subjective determination was "unsupported by any evidence at all, and is therefore arbitrary and capricious." *Id.* at 1074.

These decisions establish that when a taxpayer presents a prima facie case of the existence of obsolescence and introduces evidence quantifying its effect on the property's value, the State Board cannot simply ignore such evidence. Instead, "when a taxpayer offers probative evidence, that evidence must be dealt with in some meaningful manner." *Clark*, 694 N.E.2d at 1235; *see also Thorntown II*, 629 N.E.2d at 965. If the State Board fails to make any findings as to evidence rebutting the taxpayer's prima facie case, or enters unsupported conclusions or findings, the State Board's decision will be reversed. Furthermore, the hearing officer's subjective opinion concerning the level of obsolescence, without more, is insufficient either to rebut the taxpayer's prima facie case or to support the State Board's determination.

## Canal Square's Prima Facie Case

At the administrative hearing, Canal Square presented the testimony of Thomas J. Kaliker, an MAI-certified appraiser, together with an appraisal he had prepared valuing the Canal Square Apartments as of March 1, 1992. (Stipulation Exhibit 2–C). The appraisal was prepared using recognized appraisal principles and utilized the three recognized approaches for valuing property—the income capitalization approach, the comparable sales approach, and the cost approach. (Stipulation Exhibit 2, p. 4). Mr. Kaliker arrived at an estimate of the fair market value of the property of $10,500,000 under the income capitalization approach, $10,800,000 under the comparable sales approach, and $10,600,000 under the cost approach.[3] Mr. Kaliker reconciled the three approaches to value in arriving at a final estimate of market value of $10,600,000.[4]

In applying the cost approach, "the appraiser estimates the cost to construct a reproduction of or replacement for, the existing structure and then deducts all accrued depreciation in the property being appraised from the cost new of the reproduction or replacement structure." AM. INST. OF REAL ESTATE

---

3. Stipulation Exhibit 2–C, p. VII–1.

4. Stipulation Exhibit 2–C, p. VII–2.

APPRAISERS, THE APPRAISAL OF REAL ESTATE, 321 (10th ed. 1992). Depreciation is the loss of value from all sources, including physical depreciation and functional and external obsolescence. *Id.* at 343.

For purposes of this case, the most important part of Mr. Kaliker's appraisal is the application of the cost approach because it explicitly requires the appraiser to estimate obsolescence. The State Board's regulations also require the recognition of obsolescence and ties its definition of obsolescence directly to that applied by professional appraisers under the cost approach:

> The estimation of depreciation is an essential element in the Cost Approach. An estimate must be predicated upon a comprehensive understanding of the nature, components, and theory of depreciation, as well as practical concepts for estimating its extent in improvements being valued.

> The American Institute of Real Estate Appraisers defines depreciation as: an effect caused by deterioration and/or obsolescence. Physical Depreciation is evidenced by wear and tear, decay, dry rot, cracks, encrustations, or structural defects. Obsolescence Depreciation is composed of functional and economic loss of value. Functional Obsolescence may be due to a poor floor plan, mechanical inadequacy or superadequacy, functional inadequacy or superadequacy due to size, style, age, or other losses. It is evidenced by conditions within the property. Economic obsolescence is caused by factors external to the property, such as inharmonious property uses.

IND.ADMIN.CODE tit. 50, r. 2.1–5–1. Mr. Kaliker and the State Board's Hearing Officer agreed that the Assessment Manual's definition of obsolescence is identical to that contained in the appraisal profession's textbook.

(Kaliker Testimony, Tr. at 31; Clark Testimony, Tr. at 48). Therefore, Mr. Kaliker's estimate of obsolescence in his appraisal is directly applicable in arriving at a proper allowance for obsolescence under the Assessment Manual.

In his appraisal, Mr. Kaliker identified several sources of functional and external obsolescence affecting the Canal Square Apartments, including a narrow floor plan,[5] excessive construction features required to meet the City of Indianapolis' Canal Corridor Design Guidelines,[6] and the presence of an electrical power substation on the property site.[7] Consistent with the cost approach, Mr. Kaliker quantified the effect of such sources of obsolescence as representing a loss of value in the property compared to its estimated replacement cost (after deduction for physical obsolescence). Mr. Kaliker computed the amount of such obsolescence to be $4,900,000, or 34.35% of the replacement cost of the building (after physical depreciation). (Stipulation Exhibit 2–C, p. VI–52; Kaliker Testimony Tr. 30). To quantify obsolescence under the cost approach, Mr. Kaliker correlated the cost approach with the figures derived under the income capitalization method and the comparable sales method. Because he relied on the latter two most heavily in arriving at the market value estimate,[8] he concluded that the difference between the replacement cost of the property after physical depreciation and the value of the property as determined by the income capitalization method and the comparable sales method was necessarily attributable to obsolescence. That figure was $4,900,000 or 34.35%. (Kaliker Testimony, Tr. at 30–31, 33–35). Because the definition of obsolescence under the Assessment Manual is identical to that promulgated by the appraisal profession, it is appropriate to apply a

---

5. Stipulation Exhibit 2, p. 9; Exhibit 2–C, pp. VI–50; Exhibit 3, pp. 10; Kaliker Testimony, Tr. at 25–26.

6. Stipulation Exhibit 2, pp. 10–11; Exhibit 2–C. pp. VI–50; Exhibit 3, pp. 8; Kaliker Testimony, Tr. at 24–25.

7. Stipulation Exhibit 2, pp. 11–12; Exhibit 2–C, pp. III–12 and VI–51; Exhibit 3, pp. 9–10; Kaliker Testimony, Tr. at 26–27.

8. While True Tax Value is not market value, economic obsolescence obviously incorporates market value concepts. Therefore, a market value estimate is appropriate in the context of obsolescence. There is really no choice in this matter: the Court (and taxpayers) must either accept quantifications based on "experience" thereby making them unreviewable, or we must use market concepts.

34.35% obsolescence factor to the equivalent replacement cost less depreciation derived for the Canal Square Apartments under the Assessment Manual. (Kaliker Testimony, Tr. 31–2).

Mr. Kaliker testified that this method of quantifying obsolescence in this case was consistent with recognized appraisal principles and that he knew of no better method of quantifying it in this case. (Kaliker Testimony, Tr. at 30–31). Except for an issue about certain measurements used by Mr. Kaliker in developing his replacement cost figure,[9] the State Board's Hearing Officer did not disagree with the method used by Mr. Kaliker to quantify obsolescence. (Clark Testimony, Tr. at 38, 42, 45). This Court has also recognized the validity of Mr. Kaliker's methodology for estimating obsolescence:

> Economic obsolescence ... is ... difficult to quantify. One technique is to compare the replacement cost new, less physical deterioration, with the value of the property estimated under the income approach [that values property based on income capitalization]. If the latter amount is lower, the difference may represent economic obsolescence....

*Thorntown I*, 588 N.E.2d at 619 (quoting J. Amdur, *Property Taxation of Regulated Industries*, 40 Tax Law. 339, 360 (1987) (footnotes omitted)).[10]

Thus, by introducing an appraisal that quantified obsolescence in accordance with generally recognized appraisal principles, Canal Square established (at minimum) a prima facie case of the level of obsolescence affecting its property. Unless the State Board introduced evidence at the hearing that rebutted this prima facie case, the State Board could not properly refuse to accept its conclusions. *Cf. Borchers v. Commissioner*, 95 T.C. 82, 89–90, 1990 WL 99432 (1990) (once taxpayers make a prima facie case, burden of going forward falls on taxing authority and failure to discharge that burden entitles taxpayers to a decision in their favor), *aff'd*, 943 F.2d 22 (8th Cir.1991).

### The State Board's Failure To Rebut Canal Square's Prima Facie Case

■ At the administrative hearing, the State Board did not provide any evidence or explanation to support its subsequent determination that 10% is the appropriate amount of obsolescence depreciation to apply to the Apartments. Its Final Assessment Determination does not even mention Mr. Kaliker's appraisal study, let alone attempt to rebut it. (Stipulation Exhibit 4—Clark Testimony, Tr. 41). Thus, the State Board made no findings questioning Mr. Kaliker's testimony, his appraisal, or his quantification of the obsolescence affecting the Apartments. The lack of findings is not surprising given that there was no evidence in the record that rebutted the evidence provided by Mr. Kaliker.

The State Board also did not provide any calculations or rationale to support its application of a 10% obsolescence depreciation deduction. (Clark Testimony, Tr. at 46). In fact, the State Board's determination with regard to obsolescence does not even mention the amount it allowed. One must examine the attached property record card to discover what the amount of obsolescence was determined to be. Because the State Board failed to make any showing or present any evidence supporting its determination of obsolescence depreciation, it has not rebutted Canal Square's prima facie case. As this Court has held in the *Thorntown* cases and *GTE North*, it will not uphold a decision of the State Board rejecting the taxpayer's evidence of obsolescence when the State Board fails to make any findings that the taxpayer's evidence is inaccurate or unreliable. *Thorntown II*, 629 N.E.2d at 965–66; *GTE N.*, 634 N.E.2d at 888–89. For this reason, this Court REVERSES the State Board's Final Assessment determination as unsupported by substantial evidence.

In addition, the testimony presented by the State Board at trial supplied no additional support for the State Board's decision to allow 10% obsolescence rather than 34.35% as determined by Canal Square's appraiser.

---

**9.** *See* discussion *infra*.

**10.** *See also* The Appraisal of Real Estate at 360, which explains in more detail the theory underlying this method for quantifying obsolescence.

The State Board's obsolescence figure of 10% was based solely on the subjective judgment of the Hearing Officer with no cogent explanation of his reasoning. The Hearing Officer testified at trial:

Q. But there was no actual calculation or measurement made?

A. No.

Q. To come up with 10 percent?

A. No.

Q. If you didn't do a calculation, how do you know if your obsolescence shouldn't have been 20 percent or 30 percent?

A. That was my opinion.

Q. And what did you base your opinion on?

A. Twenty-three years of experience.

(Clark Testimony, Tr. at 46).

This Court has previously held that an unsupported subjective opinion of a hearing officer cannot rebut a taxpayer's prima facie case of obsolescence. In *Western Select*, the Court held that substantially identical testimony of a hearing officer could not support a determination to award 75% obsolescence to a building rather than 95%:

Q. Okay. Well, can you tell me how you can get more obsolete than being totally vacant and defunct?

A. That's hard to answer.

Q. Sounds like 100 percent; doesn't it.

A. No, it doesn't provide for 100 percent. The regulation provides for five percent to 95 percent.

Q. Right. It's closer than 95—to 95 than 75 when it's totally vacant and defunct; isn't it?

A. It may be. As I stated earlier, it's subjective.

Q. You don't really have any basis for saying it's 75 versus 95; right?

A. No.

639 N.E.2d at 1073.

The State Board cannot disregard such a prima facie case and adopt some different obsolescence figure based on the unsupported subjective opinion of its Hearing Officer. *See Clark*, 694 N.E.2d at 1236–1238. What

the State Board is actually doing is making penurious appraisals. Instead of quantifying obsolescence, they allow assessors to arbitrarily pick a value. When challenged, the State Board points to its expertise. In this case, Canal Square presented testimony of a professional appraiser who quantified the obsolescence affecting its property using methods consistent with well-recognized appraisal principles. The State Board responded through its hearing officer who noted his twenty-three years of experience. If the quantification of obsolescence is to have any meaningful standards, this cannot be acceptable to support a State Board finding. There is no way to determine what the hearing officer considered important in his evaluation. This recitation of expertise is nothing more than a smokescreen obscuring the fact that the State Board's hearing officers are unable to evaluate the obsolescence calculations of a professional appraiser—one who used common, quantifiable, and well accepted appraisal methods. Subjective decisions are acceptable if they are supported by something other than self-serving references to the quality of the decision maker. *See Corey v. State Bd. of Tax Comm'rs*, 674 N.E.2d 1062, 1066 (Ind.Tax Ct.1997). To allow otherwise invites unrestrained arbitrary decision making.

### Post Hoc Rationalization

At trial, the State Board's Hearing Officer asserted that Canal Square's appraisal study contained an error because it relied on a square foot amount and unit count for the Apartments with which he disagreed. (Clark Testimony, Tr. 42–43). This question about Mr. Kaliker's appraisal study was not raised in the administrative proceedings below, nor was it referred to in the written findings in the Final Assessment Determination. For this reason, it will not be considered by this Court.

■ It has long been established in Indiana that the scope of review of the trial court in a case involving the State Board is limited to a consideration of whether there is substantial evidence to support the findings and order of the State Board and whether the State Board's action constitutes an abuse of discretion, or is arbitrary or capricious.

*State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1327 (Ind.Ct. App.1981); *Stokely–Van Camp, Inc. v. State Bd. of Tax Comm'rs*, 182 Ind.App. 91, 394 N.E.2d 209, 211 (1979) (citing *State Bd. of Tax Comm'rs v. Holthouse Realty Corp.*, 170 Ind.App. 232, 352 N.E.2d 535 (1976)). This limitation on the scope of review applies to the Tax Court under IND.CODE ANN. § 33–3–5–14 (West 1996).[11] *See Wirth v. State Bd. of Tax Comm'rs*, 613 N.E.2d 874, 880 (Ind.Tax Ct.1993).

█ Under this limited scope of review, the Court has refused to consider additional reasons supporting a State Board determination that are raised before it for the first time. *Scheid v. State Bd. of Tax Comm'rs*, 560 N.E.2d 1283, 1284 (Ind.Tax Ct.1990). In *Scheid*, the Court noted that "[t]here were no written findings before the court pertaining to this newly raised reason." *Id.* The Court held that the State Board could not support its determination by "referring to reasons which were not ruled on previously but which are offered as post hoc rationalizations." *Id.* *See also 20th Century Fiberglass v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1376 (Ind.Tax Ct.1997) (refusing to allow the State Board to support its denial of a Form 133 petition based on the failure to file a valid power of attorney when that issue was not raised in the administrative proceeding nor mentioned in the State Board's written findings). Similarly, in the instant case, the State Board may not rebut Canal Square's obsolescence evidence with a post hoc rationalization not referred to in its written findings. *Cf. Indianapolis Historic Partners v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1224, 1226 n.3 (Ind.Tax Ct.1998) (taxpayer moved to file supplemental materials to rebut State Board explanation raised for the first time at oral argument following trial).

11. Section 33–3–5–14 provides:
 With respect to determinations as to whether any issues or evidence may be heard in an original tax appeal that was not heard in the administrative hearing or proceeding, the tax court is governed by the law that applied before the creation of the tax court to appeals to trial courts of final determinations made by the

## Post Hoc Failure

The basis of the State Board's post hoc gripe about the Canal Square appraisal study is that, in applying the cost approach, the appraiser used an allegedly incorrect square footage figure and unit count. The State Board's Hearing Officer asserted that Mr. Kaliker may have relied on the County Board of Review's square foot figure, which the Hearing Officer believed to be too small. However, the hearing officer could not recall what the difference in area was. (Clark Testimony, Tr. at 42–43). He also stated that there were "approximately" eight additional apartment units considered in the County Board's assessment compared to his count of units. Mr. Kaliker's appraisal identified the Apartments as consisting of 275 units. (Stipulation Exhibit 2–C, p. V–27). The property record cards attached to the State Board's Final Assessment Determination also reflect 275 units. (Stipulation Exhibit 4—133 + 27 + 115 = 275). This observation undermines the claim that there is any real difference in Mr. Kaliker's and the Hearing Officer's measurements.

Even if this Court were to consider these post hoc rationalizations the State Board has also failed to show that, if there were any differences in the measurements used by Mr. Kaliker and the Hearing Officer, it would have made any material difference in Mr. Kaliker's calculations under the cost approach.[12] Mr. Kaliker estimated the replacement cost of the apartments in reliance on three sources of data—the Marshall Valuation Service, the actual historical costs of construction, and a cost figure derived from a comparable property. (Stipulation Exhibit 2–C, at p. VI–47 and VI–48). Thus, even if the State Board had established that the square foot figure used by the appraiser was erroneous—which it has not—there is no basis in the record to conclude that its overall estimate of replacement cost would have changed materially.

department of state revenue and the state board of tax commissioners.

12. It should be noted that the cost approach is being used in this matter only for the determination of obsolescence, not for the determination of the property's value.

In any event, the Hearing Officer never shared his estimate of the building measurements with Canal Square or its representatives either during or after the hearing. (Clark Testimony, Tr. 44–45). Thus, no opportunity existed to compare or reconcile the building measurements used by the parties, and the vague and unquantified (and seemingly incorrect) allegation that there may have been such differences in no way rebuts or undermines Mr. Kaliker's appraisal conclusions. This type of controversy underscores precisely why the State Board's reasons for its decisions need to be in writing. *See Stokely–Van Camp,* 394 N.E.2d at 211. Had they been so, Canal Square could have petitioned for a subsequent hearing at the administrative level to clarify the matter. *See North Park Cinemas, Inc. v. State Bd. of Tax Comm'rs,* 689 N.E.2d 765, 769 (Ind.Tax Ct.1997) (discussing the inquisitorial vice adversarial nature of proceedings before the State Board); *see also Clark,* 694 N.E.2d at 1235. The Court will not allow the State Board to astound taxpayers in this manner.

## II. Canal Square's Land Valuation under the Marion County Land Order

Other than making a general reference to the Marion County Land Valuation Order, the State Board has not explained in its Final Assessment Determination (Stipulation Exhibit 4) or at trial the basis for the $10 per square foot figure it assigned to Canal Square's land. It has done so, however, in another case. *See Indianapolis Historic Partners v. State Bd. of Tax Comm'rs,* 694 N.E.2d at 1226, 1227–1230 (Ind.Tax Ct.1998). In that case, the State Board announced that the size of the land in question determines which part of the Land Order to use. If the land is over one acre, then that part of the Land Order designated for apartment land is used (an acreage basis). If the land is under one acre, then the land should be valued as commercial land (a square foot basis). *Id.* This "explanation" is rife with problems, and rather than repeat itself, the Court REMANDS this issue for redetermination in light of this Court's analysis in *Indianapolis Historic Partners.*

### Conclusion

For the reasons stated above, the State Board's final determination is REVERSED and this case is REMANDED to the State Board for the purpose of granting Canal Square an obsolescence depreciation deduction consistent with this opinion. The State Board is also instructed to assign the Canal Square land an acreage value from the Marion County Land Valuation Order in a manner consistent with the *Indianapolis Historic Partners* opinion.