**Robert W. MAHAN and Theodosia P. Mahan, Petitioners,**

v.

**STATE BOARD OF TAX COMMISSIONERS, Respondent.**

No. 49T10–9204–TA–00020.

Tax Court of Indiana.

Oct. 25, 1993.

John R. Rumple, Sharpnack, Bigley, David & Rumple, Columbus, for petitioners.

Pamela Carter, Atty. Gen., Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

The Petitioners, Robert W. Mahan and Theodosia P. Mahan (the Mahans), appeal the final determination of the Respondent, the State Board of Tax Commissioners (the State Board), assessing a parcel of the Mahans' Bartholomew County commercial property for the March 1, 1989, assessment.

## ISSUES

I. Whether the State Board's 1991 amendment of the 1988 Bartholomew County Land Valuation Order is effective for the March 1, 1989, assessment.

II. Whether the State Board properly addressed the question of primary and secondary use in assessing the property.

III. Whether the State Board properly graded the buildings on the property.

## FACTS

In 1986 and 1987, acting under the statutory mandate of IND.CODE 6–1.1–4–13.6, the Bartholomew County Land Valuation Commission (the Commission) collected data and determined the values of all Bartholomew County land for the 1989 reassessment. Upon completion, the Commission forwarded its recommendations and proposed order to the State Board for final approval and issuance of the Land Order. Sometime during this process, however, information was omitted. Thus the recommendations sent to the State Board were incomplete.

The State Board issued the Land Order on August 24, 1988. By that time, the local assessors had already begun the reassessment process, employing the values the Commission intended to submit to the State Board. Due to the discrepancies, the State Board's Land Order had some lower values than the Commission's proposed order. The State Board was informed of the discrepancies and amended the Land Order in March of 1991 to conform with the Commission's proposed order.

Prior to the amendment, the Land Order provided that commercial and industrial platted parcels in Columbus Township were to be valued according to the front foot method. These properties were further divided into several zones, and the parcels within Zone 5 were to have a maximum high value of $250 per front foot. The Commission's proposed order, though, had called for a maximum high value of $450 per front foot. The State Board's March 1991 Amended Land Order sanctioned both a $450 maximum high front foot value in Zone 5 and a square foot valuation method for commercial parcels in all zones.

The Mahans own commercial property in Zone 5 of Bartholomew County, Indiana, on which they operate an automobile dealership. The Mahan parcel was valued under the square foot method. The State Board issued its final determination on March 6, 1992. The Mahans filed this appeal on April 20, 1992. Additional facts will be supplied as necessary.[1]

---

**1.** On March 5, 1993, this court heard three cases in immediate succession: *McGee v. State Board of Tax Commissioners* (1993), 618 N.E.2d 70 this case, and *Irons v. Indiana State Board of Tax Commissioners*, Ind.Tax, No. 49T10–9206–TA–00043. *McGee* was tried first and presented the

## DISCUSSION AND DECISION

### STANDARD OF REVIEW

██ When acting within the scope of its authority, the State Board is accorded great deference. *Wirth v. State Bd. of Tax Comm'rs* (1993), Ind.Tax, 613 N.E.2d 874, 876 (citing *Centrium Group v. State Bd. of Tax Comm'rs* (1992), Ind.Tax, 599 N.E.2d 242, 243). Accordingly, the court will reverse the State Board's final determination only when it is unsupported by substantial evidence, constitutes an abuse of discretion, exceeds statutory authority, or is arbitrary or capricious. *Id.* (citing *Hatcher v. State Bd. of Tax Comm'rs* (1992), Ind.Tax, 601 N.E.2d 19, 20).

### I

IC 6–1.1–4–13.6, passed by the legislature in preparation for the 1989 general reassessment, provided for the establishment of county land valuation commissions throughout the state. Each commission was to determine the values of all commercial, industrial, and residential land within the county. IC 6–1.1–4–13.6(e). Subsequently, the State Board was to review the determinations made by the commission and make the modifications it deemed necessary to provide uniformity and equality. IC 6–1.1–4–13.6(f). After the State Board had completed its review, it was required to

> give notice to the county and township assessors of its decision on the values. Within twenty (20) days after that notice, the county assessor or any township assessor in the county may appeal the values to the state board. The state board shall hold a hearing on the appeal in the county. The state board shall give notice of the hearing under IC 5–3–1.

IC 6–1.1–4–13.6(g). The final stage in the process provided for dissemination of the State Board's final decision:

> [t]he county assessor shall notify all township assessors in the county of the values as determined by the commission and as modified by the state board on review or on appeal. *Township assessors shall use the values as determined by the commission and modified by the state board in making assessments.*

IC 6–1.1–4–13.6(h) (emphasis added).

While the statutory procedure was followed in Bartholomew County, the problem arose because the Land Order issued by the State Board was based on insufficient information from the Commission. This led to a conflict between the values intended by the Commission and actually used by the assessors on one hand, and the values expressed in the Land Order on the other. The issue therefore becomes two-fold: first, whether the values determined by the Commission or the values expressed by the State Board in the initial Land Order control; and secondly, whether the March 1991 Amended Land Order, conforming with the Commission's original intended figures, has any effect on the 1989 assessment.

### A. The Values

██ Land values are determined based on the appropriate unit values: front foot value, square foot value, acreage value, and site value. *See* 50 I.A.C. 2.1–2–1(b). According to the initial Land Order issued by the State Board in August of 1988, the land located in Zone 5 was to be assessed using the front foot method, with values ranging from a low of $150 per front foot to a high of $250 per front foot. In the case at bar, however, assessment of the Mahans' Zone 5 property was calculated based on the square foot method, although a square foot price was not indicated until the Amended Land Order was adopted in March of 1991. Consequently, the Mahans argue their parcel should have been priced pursuant to the front foot method, as designated by the initial Land Order. The Mahans are correct.

same questions regarding the application of the Land Order as this case. Consequently, the parties in this case, with the same counsel and witnesses as in *McGee,* chose to rely on the *McGee* testimony to develop the issue surrounding the Land Order. *See Russell v. Johnson*

(1943), 220 Ind. 649, 659, 46 N.E.2d 219, 223 (quoting *Lumiansky v. Tessier* (1912), 213 Mass. 182, 188–89, 99 N.E. 1051, 1053); *Bane v. State* (1991), Ind.App., 579 N.E.2d 1339, 1341, *trans. denied.*

IC 6–1.1–4–13.6(g) mandates the State Board to give notice of its final determination to the affected county and township assessors. IC 6–1.1–4–13.6(g). In turn, any of the assessors may petition the State Board for further review. *Id.* Regardless of any further review, the State Board's ultimate final setting of values is binding on the assessors under subsection (h): "[t]ownship assessors *shall* use the values *as determined by the commission and modified by the state board* in making assessments." IC 6–1.1–4–13.6(h) (emphasis added).

In the present case, when the State Board issued the initial Land Order, the Bartholomew County assessor, as well as the Bartholomew County township assessors, had the right to seek review. While the Zone 5 front foot valuation method and the $250 maximum high value were contained in the initial Land Order, there was no provision for square footage valuations in Zone 5. The error could easily have been corrected by appeal under IC 6–1.1–4–13.6(g). None was taken, however, and the township assessor was required to use the values, "modified by the state board," to make assessments. *See* IC 6–1.1–4–13.6(h). To allow any other reading would eviscerate the plain meaning of subsection (h), which is stated in mandatory terms. Moreover, "[t]he State Board has the *final authority* under IND.CODE 6–1.1–4–13.6 to set the values in county land valuation orders." *Wirth,* 613 N.E.2d at 878 (emphasis added). The initial 1989 assessment using the square foot valuation was therefore improper, and the initial Land Order, not the assessors' figures, is binding.

## B. The Amendment

■ When the Amended County Land Valuation Order was adopted in 1991, one of the amendments added a square foot value for commercial applications. The State Board was well within its implicit authority to amend the Land Order, *see Miller v. Gibson County Solid Waste Management Dist.* (1993), Ind.Tax, 622 N.E.2d 248, 259, (citing *Northern Indiana Pub. Serv. Co. v. Citizens Action Coali-*

*tion* (1989), Ind., 548 N.E.2d 153, 158); however, the 1991 amendment can be applied only prospectively, and thus the amendment does not ratify the 1989 actions of the local assessors. The Amended Land Order, like the initial Land Order, is the State Board's final pronouncement on the valuation of Bartholomew County realty. It is binding on county officials and constitutes a State Board rule subject to the same rules of construction as statutes. *See Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 586, *aff'd* (1992), Ind., 585 N.E.2d 1336.

■ The general rule of statutory construction is that statutes are to be given prospective effect only, unless the enacting body unambiguously and unequivocally intended retrospective effect as well. *State ex rel. Indiana State Bd. of Dental Examiners v. Judd* (1990), Ind.App., 554 N.E.2d 829, 832 (citing *Turner v. Town of Speedway* (1988), Ind.App., 528 N.E.2d 858, 863). Like other rules of construction, this one is applicable to regulatory enactments as well as statutes. *Manns v. State Dep't of Highways* (1989), Ind., 541 N.E.2d 929, 936 (citing *State ex rel. Uzelac v. Lake Criminal Court* (1965), 247 Ind. 87, 212 N.E.2d 21). Amendments, too, are to operate prospectively, *Fort Wayne National Corp. v. Indiana Department of State Revenue* (1993), Ind.Tax, 621 N.E.2d 668, 673, and retroactive application of even remedial amendments is disfavored when existing rights would be infringed. *Brane v. Roth* (1992), Ind.App., 590 N.E.2d 587, 590 (citing *Judd,* 554 N.E.2d at 832), *trans. denied.*

■ There is no evidence the State Board unequivocally and unambiguously intended the Amended Land Order, with its increased Zone 5 values and provisions for square footage valuations, to have retroactive effect. Indeed, to grant retroactive effect to the 1991 amendments would nullify subsection (g) of IC 6–1.1–4–13.6 because it would allow what is in essence an appeal from the initial Land Order, notwithstanding the expiration of subsection (g)'s time limit for appeal. Moreover, curative enactments like the 1991 amendment

"may cure defects and irregularities in proceedings even though the defects and irregularities are so flagrant as to render the proceedings null and void," *Osann v. Purported Town of Portage* (1961), 132 Ind. App. 695, 699, 177 N.E.2d 666, 668 (citing *Johnson v. Board of Comm'rs* (1886), 107 Ind. 15, 8 N.E. 1), but they cannot cure every error.

In *Johnson,* our supreme court established the outer limits, in the non-constitutional context, of retroactivity. "[C]urative statutes will not be sustained as legalizing proceedings had without jurisdiction over the subject-matter or the person, and where there was an entire lack of power on the part of the court, body, or officer, whose proceedings are sought to be legalized." *Osann* at 699–700, 177 N.E.2d at 668 (quoting *Johnson,* 107 Ind. at 19–20, 8 N.E. at 3). In the case at bar, the State Board issued the initial Land Order, thereby defining the outer limits of the power and authority of the local assessors. The local assessors went beyond their authority, setting land values and methods without any authorization from the State Board. They not only set values on their own, which they were without power to do, but they disregarded the State Board's initial Land Order, despite the clear language of IC 6–1.1–4–13.6(h). This they simply could not do, and the State Board's 1991 amendment therefore cannot ratify their actions. Thus, the assessment of the Mahans' property by the square foot valuation method was in excess of the State Board's statutory authority.[2]

### II

■ In addition to several buildings, the Mahan property has a paved parking area as well as a grassy area. The Mahans therefore contend that the State Board abused its discretion in refusing to apply 50 I.A.C. 2.1–4–2(f) and Instructional Bulletin RO–33 to their property. More specifically, the Mahans allege the State Board erred in that it did not make an adjustment on the land value to reflect the 38 percent of the site without improvements or paving.

Both the regulation and the Bulletin address issues of defining and valuing primary and secondary land uses. The concepts of primary and secondary land use, however, are applicable only to land valued by the square foot or acreage methods. 50 I.A.C. 2.1–4–2(f); *see also Wirth,* 613 N.E.2d at 877–78. Because the State Board will value the Mahan property according to the front foot method as prescribed by the initial Land Order, the concepts of primary and secondary land use are inapplicable to the assessment of that property.

### III

### *METAL–SIDED, PRE–ENGINEERED KIT STRUCTURES*

The Mahans contend that the buildings on their property should have been given a grade and design factor of "D–2" under 50 I.A.C. 2.1–4–3. The State Board graded the buildings as "C–2." In 1991, the State Board issued a memorandum and Instructional Bulletin 91–8 which reduced the base rates for pre-engineered buildings. The Mahans argue their buildings are pre-engineered structures and therefore eligible for a reduction in grade equal to the change in base rate.

■ In Indiana, property is assessed according to the State Board's regulations for determining true tax value, not market value. *See* IND.CODE 6–1.1–31–6(c). Grade factors are assigned to structures to account for variations in value due to differences in the quality of materials and work-

---

**2.** The Mahans also contend a 1984 replat of their property, which combined two lots into one, indicates the property should be assessed as one parcel and not two. More specifically, the Mahans assert that although a section line runs through their property, only one parcel exists and the property should, therefore, be assessed as only one parcel. During trial, the State Board's hearing officer testified that the replat had no effect on the assessment and the property was assessed as only one parcel. The issue whether the Mahan property should be assessed as one parcel or two therefore need not be addressed. The State Board has assessed the property once as a single parcel. When the State Board reassesses the property in accordance with the initial Land Order, it shall again consider the lot as one parcel.

manship and in the architectural style and design. 50 I.A.C. 2.1–4–3(f).

■ The taxpayer, like any other party appealing an administrative decision, bears the burden to show the State Board's assessment was inaccurate. *Wirth*, 613 N.E.2d at 876 (citing *Meridian Hills Country Club v. State Bd. of Tax Comm'rs* (1987), Ind.Tax, 512 N.E.2d 911, 913). The Mahans, however, offered no proof at the administrative hearing of the proper grade for the buildings other than their opinion. This is insufficient to overcome their burden. The hearing officer testified, however, that based on his visual inspection, the buildings in question did not qualify for the reduction.

■ The determination of the proper grade and design factor requires assessors to make a variety of subjective judgments regarding variations in the quality of materials and workmanship and the quality of style and design:

> the grade selected represents a composite judgment of overall quality and design. Generally, the quality of materials and workmanship is fairly consistent throughout the construction of a structure. However, this may not always be the case, and it is sometimes necessary to weigh the quality of individual major components in order to arrive at the proper composite quality rating.

50 I.A.C. 2.1–4–3(f). The State Board determined that the buildings contained average materials and workmanship for the year they were constructed, indicating a C grade; however, the lack of architectural treatment and only minimal built-in features indicated a D grade. *See id.* As a result, the hearing officer assigned a grade of "C–2." As long as the State Board did "not abuse its discretion in exercising its subjective judgment on a matter within the

scope of its authority," the court will not reverse the State Board's determination. *Wirth*, 613 N.E.2d at 878 (citing *Hatcher*, 601 N.E.2d at 20; *Centrium Group*, 599 N.E.2d at 243). The State Board provided sufficient evidence supporting its determination to show there was no abuse of discretion in the "C–2" grade.[3]

### WALL TYPE/CAR WASH BASE PRICE

Finally, the Mahans assert the State Board erred in classifying the automobile showroom's walls as type 2 instead of type 1.[4] The Mahans also contend the car wash on their property should have been graded "D" instead of "C."

In its final determination, the State Board used the wall "Code 2" classification to calculate the base price because of the predominance of glass and stone used in building the exterior walls. "Code 2" is used to denote "brick, stone, concrete, or equal" wall types. 50 I.A.C. 2.1–4–3(a). In its rationale, the State Board determined glass costs as much or more than other "Code 2" exterior wall types. The State Board also determined that the average quality grade of the car wash was consistent with the attached garage portion of the building constructed at the same time and also graded "C." *See* 50 I.A.C. 2.1–4–3(f).

Once again, the only evidence the Mahans presented was their opinion that the showroom walls should be classified "Code 1" and that the car wash should have been graded "D." This is insufficient to show the State Board's determination was arbitrary and capricious or an abuse of discretion in light of the hearing officer's testimony. *See Wirth*, 613 N.E.2d at 879. As a result, the State Board's determination of wall classification and grade stands.

---

**3.** The Mahans seek to apply the benefit of the State Board's 1991 memorandum and instructional bulletin retroactively. Earlier in this matter, however, the Mahans correctly argued the 1991 Amended Land Order could not be retroactively applied to the same assessment. The Mahans cannot have their cake and eat it too. As stated earlier, regulatory enactments

and amendments are given prospective effect only. *Manns*, 541 N.E.2d at 936; *Fort Wayne Nat'l Corp.*, 621 N.E.2d at 673.

**4.** The specific language in 50 I.A.C. 2.1–4–3(a) denotes wall types as "Code 1," "Code 2," and "Code 3."

## CONCLUSION

The court finds the State Board acted in excess of its statutory authority in using the Amended Land Order to set the Mahans' land value for the March 1, 1989, assessment. Accordingly, the court now REVERSES the State Board's final determination on that issue and REMANDS the matter to the State Board for assessment of the parcel in accordance with the initial Land Order.

The Mahans, however, have failed to show any abuse of discretion or other error in the State Board's determination of property use and improvement grading. Therefore, the court AFFIRMS the State Board's final determination addressing those issues.