Juan C. GARCIA and Maria
N. Garcia, Petitioners,

v.

STATE BOARD OF TAX
COMMISSIONERS,
Respondent.

No. 71T10–9601–TA–00004.

Tax Court of Indiana.

April 24, 1998.

Timothy D. Hernly, James A. O'Brien, Philip J. Faccenda, Jr., Barnes & Thornburg, South Bend, for petitioners.

Jeffrey A. Modisett Attorney General, Marilyn S. Meighen, Deputy Attorney General, Indianapolis, for respondent.

FISHER, Judge.

The Petitioners, Juan C. Garcia and Maria N. Garcia, appeal a final determination of the State Board of Tax Commissioners (State Board) assessing their real property as of March 1, 1993. The Garcias raise two issues in this original tax appeal:

I. Whether the application of an "A + 4" (240%) grade and design factor to the Garcias' home was erroneous.

II. Whether the application of a grade and design factor to the Garcias' swimming pool enclosure was erroneous.

## FACTS AND PROCEDURAL HISTORY

The Garcias' home is located in South Bend, Indiana and consists of approximately 10,000 square feet of living space including a 2,717 square foot indoor swimming pool area. The swimming pool enclosure was constructed by the same builder who constructed the Garcias' home. The Garcias' home contains cherry wood kitchen cabinets, four furnaces, vaulted ceilings, unusually large gas and water supply lines, more than twenty windows on the front of the home, and various other amenities.

Originally, the Penn Township assessor assigned the Garcias' home an "A + 10" grade. *See* IND.ADMIN.CODE tit. 50, r. 2.1-3-2 (1992) (presently codified at *id.* r. 2.2-7-6 (1996)). The Garcias filed a Form 130 Petition for Review of Assessment with the St. Joseph County Auditor. The Auditor determined that the Garcias' home was properly assessed, and therefore no change in the Garcias' assessment resulted.

On March 15, 1994, the Garcias filed a Form 131 Petition for Review of Assessment with the State Board. A hearing was held on July 14, 1994. The State Board issued its final determination on December 8, 1995, listing fifteen specific findings. In its final determination, the State Board reduced the grade applied to the Garcias' home from "A + 10" to "A + 4" and applied an "A+4" grade factor to the swimming pool enclosure. The result of the State Board's findings is that the assessed value of the Garcias' home decreased by $51,130. The Garcias filed this original tax appeal on January 19, 1996. A trial was held on July 11, 1996, followed by oral argument on November 7, 1996. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

This Court gives the final determinations of the State Board great deference

when the State Board acts within the scope of its authority. *Indiana Sugars, Inc. v. State Bd. of Tax Comm'rs,* 683 N.E.2d 1383, 1385 (Ind. Tax Ct.1997). This Court reverses final determinations of the State Board only when those decisions are unsupported by substantial evidence, are arbitrary or capricious, constitute an abuse of discretion, or exceed statutory authority. *Id.*

## Discussion

I. Was the application of an A + 4 (240%) grade and design factor to the Garcias' home in error?

The Garcias' first contention is that the State Board's application of an "A + 4" grade factor was an abuse of discretion, was arbitrary or capricious, was unsupported by substantial evidence, and results in a nonuniform and unequal assessment of the Garcias' home. The Garcias argue that the regulations regarding the application of grade factors provide no ascertainable standards allowing a taxpayer or this Court a meaningful opportunity to review an assessment. The requirement of ascertainable standards is imposed to ensure that "[a]dministrative decisions are fair, orderly and consistent rather than irrational and arbitrary. The standards should be written with sufficient precision to give fair warning as to what the agency will consider in making its decision." *Podgor v. Indiana Univ.,* 178 Ind.App. 245, 258, 381 N.E.2d 1274, 1283 (1978); *see also Town of St. John v. St. Bd. of Tax Comm'rs,* 690 N.E.2d 370, 372–73 (Ind. Tax Ct.1997), *review granted; Mechanics Laundry & Supply, Inc. v. Department of State Revenue,* 650 N.E.2d 1223, 1233 (Ind. Tax Ct.1995); *Harlan Sprague Dawley, Inc. v. Department of State Revenue,* 605 N.E.2d 1222, 1232 (Ind. Tax Ct.1992); *Harrington v. State Bd. of Tax Comm'rs,* 525 N.E.2d 360, 361 (Ind. Tax Ct.1988). When the State Board applies vague regulations and assessment techniques, the Court cannot effectively review the assessment and is compelled to find the assessment arbitrary and capricious. *See Harrington,* 525 N.E.2d at 362.

In Indiana, property is assessed according to its True Tax Value. *See* IND.CODE ANN. § 6-1.1-31-6 (West 1989); *see also Town of*

*St. John,* 690 N.E.2d at 384–85 (describing the True Tax Value system). The True Tax Value of a residential improvement is calculated by determining the whole dollar cost of reproducing the improvement as determined under the rules and regulations of the State Board. *See* IND.ADMIN.CODE tit. 50, r. 2.2-7-7.1, -9 (1996); *see also id.* r. 2.2-2-1(c) (1996); *see also Town of St. John,* 690 N.E.2d at 373. Assessors use cost schedules to determine the base reproduction cost of a dwelling. *See* IND.ADMIN.CODE tit. 50, r. 2.1-3-5 (1992) (presently codified at IND.ADMIN.CODE tit. 50, r. 2.2-7-11 (1996)). Grade factors ranging from "A" to "E" are then applied to account for the particular construction qualities and amenities of a particular home. *See* IND.ADMIN.CODE tit. 50, r. 2.1-3-2.

The selection of which grade should be applied to an improvement calls for a subjective judgment and is committed to the discretion of the assessor. *See Mahan v. State Bd. of Tax Comm'rs,* 622 N.E.2d 1058, 1064 (Ind. Tax Ct.1993). The assessor must make a "composite judgment of overall quality and design.... [I]t is sometimes necessary to weigh the quality of individual major components in order to arrive at the proper composite quality rating." *See* IND.ADMIN.CODE tit. 50, r. 2.1-4-3(f) (1992) (presently codified at *id.* r. 2.2-7-6(f) (1996)). Although the selection of a grade is a subjective determination, subjective determinations are still subject to judicial review. *See Corey v. State Bd. of Tax Comm'rs,* 674 N.E.2d 1062, 1066 (Ind. Tax Ct.1997). The State Board's regulations define the different characteristics that help assessors differentiate between grades. For instance, "A" grade dwellings have an "outstanding architectural style and design and ... are constructed with the finest quality materials and workmanship throughout." *See* IND.ADMIN.CODE tit. 50, r. 2.1-3-2. "B" grade dwellings are "architecturally attractive dwellings constructed with good quality materials and workmanship throughout." *Id.* "C" grade dwellings are "moderately attractive dwellings constructed with average quality materials." *Id.* "D" grade dwellings are "constructed with economy quality materi-

als" and are described as "void of architectural treatment." *Id.* "E" grade dwellings are constructed with "very cheap grade materials . . . and very poor quality workmanship." *Id.*

The State Board has also included a table in its regulations that offers some guidance for assessors in selecting the basic grade classification. *See id.* (presently codified at *id.* r. 2.2–7–6(b)). The Grade Specification Table gives examples of elements and construction qualities that are indicative of the respective grades. The regulations also recognize that an improvement might contain elements indicative of more than one grade. Therefore, an assessor is instructed to "weigh the quality of individual major components in order to arrive at the proper composite quality rating." *Id.*

Under the State Board's regulations, "C" grade dwellings are considered average and are assigned a grade factor of 100%, (i.e., 100% of the reproduction cost as determined under the State Board's regulations). *See id.* (presently codified at *id.* r. 2.2–7–6(e)). The remaining grades indicate a factor of 160% of the base price for "A" grade dwellings, 120% for "B" grade dwellings, 80% for "D" grade dwellings, and 60% for "E" grade dwellings. *Id.*

The State Board recognized that "[d]wellings sometimes fall in between the major classifications, or at intermediate grade levels." *See id.* (presently codified at *id.* r. 2.2–7–6(e)). Therefore:

> [a] method of interpolation is . . . built into the system whereby intermediate grade levels are indicated by suffixing the letter symbol ("A" through "E") of the major classification with one of the following[:]
>
> > + /–2 to indicate that the grade falls halfway between the assigned grade classification and the grade immediately above or below it. . . .
> >
> > + /–1 to indicate that the grade falls slightly above or below the assigned grade classification. . . .
>
> Grades that fall below "E" . . . are indicated by "–1" through "–4" (each of which

represents a reduction of the factor by 10%, so that "E–4" equals a factor of 0%).

Grades that fall above "A" are indicated by "+ 1" through "+ 10" (each of which represents an increase of the factor by 20%, so that "A + 10" equals a factor of 360%).

*Id.* Unlike the definitions of the major grade classifications, there is no guidance in the regulations differentiating an "A" grade dwelling from an "A + 10" dwelling. *See Town of St. John,* 690 N.E.2d at 386. However, the difference to the taxpayer of an "A" or "A + 10" assessment is enormous. *Id.* An "A" dwelling is priced at 160% of its base price, but an "A + 10" dwelling is priced at 360% of its base price. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–2; *see also Town of St. John,* 690 N.E.2d at 386.

■ The decision of whether a dwelling is an "A" grade or an "A + 10" or an "A + 4" is entirely left to the assessor's subjective judgment. Not only does this fail to provide ascertainable standards; it provides no standards whatsoever. This Court has recently said "[t]he lack of ascertainable standards is particularly pronounced in the 'A' grade classification." *Town of St. John,* 690 N.E.2d at 386. The State Board's regulations make no effort to say why a grade of "A + 4" is more appropriate for a dwelling than an "A" grade. Instead, assessors are left with little more than guess work when applying grade factors to homes. A 200% difference in base price is based solely on the assessor's judgment of what intermediate grade level the assessor decides a home deserves. This provides no ascertainable standards.

The Court notes that in the present case, the hearing officer, as well as the builder of the Garcias' home, offered some testimony that supported the selection of the "A" grade for the Garcias' home. For instance, the hearing officer testified that the exterior of the Garcia residence was indicative of an "A" grade. (Trial Tr. at 92). The hearing officer also testified that the structural elements of the roof, such as the presence of multiple gables and wood trusses,[1] indicated an "A"

1. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–2.

grade. (Trial Tr. at 93). Finally, the home builder testified that the Garcias' home has high quality cabinets, light fixtures, plumbing fixtures, and a custom heating system, all indicative of an "A" grade.[2] (Trial Tr. at 15–16). Regardless, there is still no guidance in the regulations regarding what constitutes an "A + 4" grade.

Although the State Board's regulations offer some guidance regarding characteristics of the basic grades, those definitions are vague. Words such as "generous" and "extensive" provide little in the way of direction with respect to the selection of the proper grade. More importantly, for purposes of this case, there are absolutely no definitions or guidelines that allow an assessor, this Court, or the taxpayer the ability to differentiate between an "A + 10" or an "A" grade dwelling. Therefore, this Court is "compelled to find that the State Board's assessment ... is arbitrary and capricious." *Harrington*, 525 N.E.2d at 362. This issue is REMANDED to the State Board for further consideration.

### II. Was the application of a grade and design factor to the Garcias' swimming pool enclosure in error?

The Garcias' second contention is that the State Board erred when it applied an "A + 4" grade factor to the Garcias' swimming pool enclosure. The appropriate schedule for valuing swimming pool enclosures is Schedule G.1. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–5 (1992) (presently codified at *id.* r. 2.2–9–6 (1996)). Schedule G.1 appears in the State Board's regulations as follows:

### Swimming Pool Enclosures

Cost represents average cost ranges per square foot of complete shell-type enclosures or buildings excluding swimming pools and aprons.

Type–1 Unfinished—none of the following items are finished; floor, ceiling, or walls.

Type–2 Semi-finished—one or two of the following are finished in a similar quality as the dwelling; floor, ceiling, or walls.

Type–3 Finished—all of the following items, floors, ceiling, and walls are finished commensurate with the quality of the dwelling.

| Area | Type–1 | Type–2 | Type–3 |
|------|--------|--------|--------|
| 100 | 37.90 | 41.85 | 46.90 |
| 200 | 26.80 | 30.40 | 35.10 |
| 300 | 22.30 | 25.80 | 30.35 |
| 400 | 19.75 | 23.15 | 27.60 |
| 500 | 18.10 | 21.40 | 25.80 |
| 600 | 16.90 | 20.15 | 24.50 |
| 700 | 15.95 | 19.20 | 23.50 |
| 800 | 15.25 | 18.45 | 22.75 |
| 900 | 14.65 | 17.80 | 22.10 |
| 1000 | 14.15 | 17.30 | 21.55 |

*Id.* The Garcias' pool enclosure was classified as a Type–3 enclosure. However, schedule G.1 only provides per square foot values for pool enclosures that measure 1,000 square feet or less. The Garcias' pool enclosure is 2,717 square feet. Faced with these facts, the hearing officer simply selected the per square foot value for the highest square footage available on the schedule (1,000 square foot value for Type–3 enclosures ($21.55)) to calculate the assessed value of the Garcias' pool enclosure. The hearing officer then multiplied by 2.4 (240%) based

2. Although the presence of these items might support the selection of an "A" grade, the hearing officer was less than lucid when attempting to articulate some of the standards he applied to assign an "A" grade to the Garcias' home. For instance, when asked what constituted a "generous" roof overhang (one of the elements indicative of a "B" grade), the hearing officer testified that "I would call an average roof overhang ... like two feet. If it would be more than that it would be generous." (Trial Tr. at 33). When asked to define an "extensive" roof overhang (an element indicative of an "A" grade), the hearing officer stated "anything over two feet I'm going to take a closer look at and try and [sic] determine in my mind what is extensive." (Trial Tr. at 33). When asked to discuss the process he goes through to select a grade for a home, the hearing officer testified "[y]ou have to start with a 'C' grade structure because that's what the manual is based on.... And they're an average typical house. I feel as though I live in a 'C' grade house, so I feel I know what average is." (Trial Tr. at 72).

on the grade factor of "A + 4" reasoning that, "if the dwelling is an 'A + 4,' then its only common sense that the enclosure has to be an 'A + 4.'" (Trial Tr. at 56). This resulted in a value of $51.72 per square foot for the Garcias' pool enclosure. The Garcias contend that the hearing officer should have extrapolated the values, based on schedule G.1, in order to determine the correct square foot value for a pool enclosure of approximately 2,700 square feet. The Garcias further contend that the hearing officer's application of the grade factor to the Garcias' pool enclosure was improper.

Turning first to the issue of extrapolation, the Garcias argue that the hearing officer and the State Board should have extrapolated the figures in the schedule in order to determine the correct value per square foot of a 2,700 square foot pool enclosure. In fact, the regulation pertaining to the application of schedule G.1 instructs assessors to "interpolate [sic] [extrapolate] only if the size falls outside of the given size range. This should be done using the same rate applicable to the smallest and largest size intervals given." IND.ADMIN.CODE tit. 50, r. 2.1–3–4 (1992) (presently codified at *id.* r. 2.2–9–3 (1996)). In this case, the size of the Garcias' pool enclosure falls outside the largest size listed in the cost schedule for pool enclosures. ·

■ The table should have been extrapolated to determine the appropriate square foot value for the Garcias' pool enclosure. When asked why he did not extrapolate, the hearing officer responded "I don't know that that is permissible in that particular schedule. I'm not aware of it." (Trial Tr. at 59). Ignorance of the applicable regulations is insufficient to support an argument that extrapolation is not required. The failure to extrapolate the values contained in schedule G.1 is arbitrary and capricious and an abuse of discretion.

The Garcias contend that the valuation process for pool enclosures should end here. Nothing more than a simple multiplication of the square footage of the pool enclosure by the correct per square footage value is required to accurately assess a pool enclosure. The Garcias argue that although the cost

schedules applicable to most residential yard improvements (such as gazebos, car sheds, detached garages, and stables) specifically instruct the assessor to adjust using a grade factor, the cost schedule applicable to swimming pool enclosures is silent with respect to the application of grade factors. Therefore, the application of a grade factor is not authorized by the regulations.

The State Board argues that the regulations allow for the application of a grade factor to the pool enclosure. This is presumably to account for variations in materials and costs associated with the construction of certain pool enclosures. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–2. The State Board is incorrect.

■ Administrative rules and regulations are subject to the same rules of statutory construction as statutes. *Poracky v. State Bd. of Tax Comm'rs,* 635 N.E.2d 235, 236 (Ind. Tax Ct.1994); *see also Western Select Properties v. State Bd. of Tax Comm'rs,* 639 N.E.2d 1068, 1073 (Ind. Tax Ct.1994); *Mahan v. State Bd. of Tax Comm'rs,* 622 N.E.2d 1058, 1062 (Ind. Tax Ct.1993). Regulations must be read within the context of the entire section of which they are part, giving effect to each word if possible. *See Sangralea Boys Fund, Inc. v. State Bd. of Tax Comm'rs,* 686 N.E.2d 954, 958 (Ind. Tax Ct.1997), *review denied; see also GTE N., Inc. v. State Bd. of Tax Comm'rs,* 634 N.E.2d 882, 890 (Ind. Tax Ct.1994). Courts are not free to assume that the use of language in one section is applicable to a separate section. *See Jefferson Smurfit Corp. v. Department of State Revenue,* 681 N.E.2d 806, 810 (Ind. Tax Ct.1997). In construing Indiana statutes (or in this case regulations), this Court has said that what a statute does not say is just as important as what it does say. *See LeSea Broad. Corp. v. State Bd. of Tax Comm'rs,* 525 N.E.2d 637, 639 (Ind. Tax Ct.1988).

In this case, some of the cost schedules contained in schedule G.1 *expressly* require the use of grade factors. For instance, the cost schedules for use in valuing boathouses, gazebos, greenhouses, car sheds, and stables expressly require the assessor to "[a]djust

for quality grade from Schedule F." *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–5. However, the schedule for pool enclosures contains no such instruction. The State Board asks the Garcias and this Court to believe that the regulations intended assessors to apply a grade factor, even in instances where the regulations were silent with respect to such an application. Such a reading of the regulations would make the express requirement of the use of grade factors with some cost schedules superfluous. This is contrary to accepted principles of statutory construction. *See Guinn v. Light,* 558 N.E.2d 821, 823 (Ind.1990); *see also Sangralea Boys Fund,* 686 N.E.2d at 958. The regulations do not expressly provide that a grade factor is to be applied when using the cost schedule for pool enclosures, but expressly provide that a grade factor is to be applied when using other cost schedules. This leads to the conclusion that the regulations were drafted with the intent to specifically delineate which cost schedules required the application of a grade factor.

In addition to the absence of specific language in the regulations requiring the application of a grade factor, the presence of the Type 1, 2, and 3 pool enclosure descriptions in the schedule seems to substitute for the concept of grade. There is simply no need to divide the cost schedule into three categories based on the quality of construction and materials used if the next step in valuing a pool enclosure is to adjust for grade to account for the same concerns. An application of a grade factor to a pool enclosure would render the Type 1, 2, and 3 distinctions superfluous.

The State Board argues that the language preceding the pool enclosure cost schedule, which reads "[c]ost represents average cost ranges per square foot," means that a grade factor is to be applied. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–5. The State Board contends that average construction quality is a concept that is pervasive throughout the regulations. (Oral Arg. Tr. At 24). Therefore, the State Board contends that if a pool enclosure is better than a "C" grade quality, you must "bump it up" and this "language in the regulation allows [the State Board] to apply

grade" to effect such an adjustment. (Oral Arg. Tr. At 24).

As noted above, some of the schedules for valuing residential yard improvements specifically direct the State Board to apply a grade factor. Some of the schedules that direct the application of a grade factor also state that the values in the schedule represent average quality. For instance, the schedules for greenhouses, stables, and car sheds specifically provide for the application of a grade factor. *See* IND.ADMIN.CODE tit. 50, r. 2.1–3–5. However, each schedule also states that the values are "[p]er square foot, average quality." *Id.* Therefore, the regulations make clear when the application of a grade factor is proper, even in those schedules where average quality is reflected by the pricing schedule. The State Board's claim that the language contained in the pool enclosure schedule means a grade factor should be applied fails to recognize this fact. Moreover, this interpretation of the schedules would render the instruction contained in some of the schedules to apply a grade factor superfluous. Why include language authorizing the application of a grade factor in some of the schedules if the concept of average quality construction automatically allows such action?

Based on these considerations, the application of a grade factor to a pool enclosure is an abuse of discretion. The issue of the valuation of the Garcias' pool enclosure is REMANDED to the State Board for an extrapolation of schedule G.1 with respect to pool enclosures and a reassessment of the Garcias' pool enclosure based on that extrapolation.

### CONCLUSION

For the foregoing reasons, this cause is REMANDED to the State Board for further consideration consistent with this opinion.