**EDGCOMB METALS COMPANY,**
**Petitioner,**

v.

**DEPARTMENT OF LOCAL GOVERN-**
**MENT FINANCE [1], Respondent.**

**Nos. 49T10–9811–TA–143, 49T10–9710–**
**TA–183, 49T10–9610–TA–135.**

Tax Court of Indiana.

Feb. 5, 2002.

---

1. The State Board of Tax Commissioners ("State Board") was originally the Respondent in this appeal. However, the legislature abolished the State Board as of December 31,

2001. P.L. 198–2001, § 119(b)(2). Effective January 1, 2002, the legislature created the Department of Local Government Finance ("DLGF"), *see* Indiana Code § 6–1.1–30–1.1 (West Supp.2001)(eff. 1–1–02); P.L. 198–2001, § 66, and the Indiana Board of Tax Review ("Indiana Board"). IND.CODE § 6–1.5–1–3 (West Supp.2001)(eff. 1–1–02); P.L. 198–2001, § 95. Pursuant to Indiana Code

§ 6–1.5–5–8, the DLGF is substituted for the State Board in appeals from final determinations of the State Board that were issued before January 1, 2002. IND.CODE § 6–1.5–5–8 (West Supp.2001)(eff. 1–1–02); P.L. 198–2001, § 95. Nevertheless, the law in effect prior to January 1, 2002 applies to these appeals. *Id. See also* P.L. 198–2001, § 117. Although the DLGF has been substituted as the Respondent, this Court will still reference the State Board throughout this opinion.

Barton T. Sprunger, Mark J. Richards, Ice Miller, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Ted J. Holaday, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Edgcomb Metals Company ("Edgcomb") appeals from three final determinations of the State Board of Tax Commissioners ("State Board"), that assessed Edgcomb's business personal property for the March 1, 1995, 1996, and 1997 assessment dates. Edgcomb claims that the State Board failed to grant it an exemption, under Indiana Code § 6–1.1–10–29.3, on a portion of its personal property stored in interstate commerce. The sole issue before this Court is whether, under that statute, Edgcomb's cutting of sheet steel into smaller, "standard cut" pieces constitutes "repackaging" or "processing."

### Facts and Procedural History

The parties have stipulated to the relevant facts. Edgcomb, a Delaware corporation, owns and operates a steel service center in Indianapolis, Indiana. During the 1995, 1996, and 1997 tax years, Edgcomb purchased large sheets of steel from mills both inside and outside Indiana and then resold them to customers both inside and outside of Indiana. Because each sheet of steel could reach lengths of up to 100 feet and was cumbersome to transport, the mills wrapped the sheet metal on large coils before shipping it to Edgcomb's warehouse. Each coil weighed as much as 40,000 pounds and was held together by a metal band.

Edgcomb stored the steel as inventory in its warehouse until a customer placed an order for the steel. Edgcomb's steel inventory consisted of three groups: 1) "as is" steel, or steel left in its current shape and size on the coil and sold to customers on the coil; 2) "custom cut" steel, or steel cut off the coil and into specific sizes or shapes pursuant to a customer request; and 3) "standard cut" steel, or steel cut off the coil and into smaller, basic geometric shapes (e.g., 48″ × 96″) and stored as open stock. Edgcomb cut the steel into standard-sized pieces in order to facilitate storage and handling in its warehouse, and to allow easier transportation via a common carrier.

To create "standard cut" pieces, Edgcomb had to first unwind and then "level" the steel. Specifically:

> [t]he coil [was] picked up by a crane and placed on a spindle. . . . The band [was] removed, and sheet steel [was] unwound from the coil [and] fed through a leveler, which consist[ed] of rollers [that] remove[d] most of the curl . . . placed in the sheet steel when the mill wound it into a coil for purposes of shipment to Edgcomb. The sheet continue[d] through a cutter which cut[ ] sheet steel to standard sizes. At the end of the line [was] a stacker, where sheets drop[ped] down into a stack and [were] then removed for placement in shelving or packaged, along with a protective covering, for shipment.

(Pet'r Br. at 7.) Because the "standard cut" pieces were stored in inventory as open stock, Edgcomb's customers were often able to purchase these pieces for their immediate use, instead of having a piece of steel "custom cut" (for which there was an additional charge).

When Edgcomb filed its 1995, 1996, and 1997 personal property tax returns, it claimed an exemption on the "standard cut" steel under Indiana Code § 6–1.1–10–29.3 on the grounds that it had merely been repackaged and was ready for trans-

shipment out-of-state. After performing an audit, however, a hearing officer for the State Board determined that the "standard cut" steel had not been repackaged, but had been further processed to form a saleable good. Consequently, the hearing officer concluded that Edgcomb's inventory of "standard cut" steel was not exempt under Indiana Code § 6–1.1–10–29.3. The State Board affirmed the hearing officer's determination and denied the exemption for all three years.[2] Edgcomb timely filed its notice of intent to appeal with this Court. Additional facts will be supplied as necessary.

### Standard of Review

■■ . This Court accords great deference to the State Board when it acted within the scope of its authority. *Garcia v. State Bd. of Tax Comm'rs,* 694 N.E.2d 794, 795–96 (Ind. Tax Ct.1998). Accordingly, the Court will reverse a final determination by the State Board only if it is unsupported by substantial evidence, constitutes an abuse of discretion, exceeds statutory authority, or is arbitrary and capricious. *Id.*

■ Furthermore, an interstate commerce exemption, like any other tax exemption, is strictly construed against the taxpayer and in favor of taxation, *Monarch Steel Co. v. State Bd. of Tax Comm'rs,* 611 N.E.2d 708, 713 (Ind. Tax Ct.1993), and the taxpayer bears the burden of proving that it is entitled to the exemption. *See Dav–Con, Inc. v. State Bd. of Tax Comm'rs,* 644 N.E.2d 192, 194 (Ind. Tax Ct.1994). This is so "because an exemption releases property from the obligation of bearing its share of the cost of government and serves to disturb the equality and distribution of the common burden of government upon all property[.]" *St.*

*Mary's Med. Ctr., Inc. v. State Bd. of Tax Comm'rs,* 534 N.E.2d 277, 280 (Ind. Tax Ct.1989), *aff'd,* 571 N.E.2d 1247 (Ind.1991). Of course, the Court's objective remains to ascertain and effect the intent of the legislature, so the Court will not read an exemption "so narrowly its application is defeated in cases rightly falling within its ambit." *Harlan Sprague Dawley, Inc. v. Dep't of State Revenue,* 605 N.E.2d 1222, 1225 (Ind. Tax Ct.1992).

In this case, Edgcomb claims the exemption from Indiana's personal property tax provided in Indiana Code § 6–1.1–10–29.3. The statute provides:

> Personal property shipped into Indiana is exempt from property taxation if the owner ... is able to show by adequate records that the property:
>
> (1) is stored in an in-state warehouse for the purpose of transshipment to an out-of-state destination; and
>
> (2) is ready for transshipment *without additional manufacturing or processing, except repackaging.*

IND.CODE § 6–1.1–10–29.3 (emphasis added). The State Board does not dispute that Edgcomb's "standard cut" steel is stored in an in-state warehouse for the purpose of transshipment to an out-of-state destination. Rather, the issue is whether Edgcomb's cutting of steel into "standard cut" pieces constitutes more than "repackaging."

To resolve the issue, Indiana Code § 6–1.1–10–29.3 must first be read in context with the other interstate commerce exemptions: it stands as an alternative exemption for taxpayers unable to qualify for the "original package" exemptions provided in

---

**2.** The State Board's final determinations were dated September 16, 1996, September 10, 1997, and September 28, 1999.

Indiana Code §§ 6–1.1–10–29(b)(1) [3] and 6–1.1–10–30(a), (b), and (c).[4] Although there are important differences among sections 29(b), 30(a), 30(b), and 30(c), they share the common requirement that the goods in question be stored in their original packages for the purpose of shipment or transshipment out of state. "Original package" refers to the container in which the goods are shipped to or placed in the storage facility. The regulations define "original package" as "the box, case, bale, skid, bundle, parcel, or aggregation thereof bound together and used by the seller, manufacturer, or packer of shipment." IND. ADMIN. CODE tit. 50, § 4.2–12–5(d). The emphasis in these provisions is on the fact that the taxpayer has maintained the integrity of the original shipping boxes or cartons.

 Indiana Code § 6–1.1–10–29.3 "stands for the proposition, however, that all is not necessarily lost if the taxpayer opens the 'original packages' and transfers the goods to other containers." *Sony Mu-*

---

3. Indiana Code § 6–1.1–10–29(b)(1) states:
 Personal property owned by a manufacturer or processor is exempt from property taxation if the owner is able to show by adequate records that the property[ ] is stored and remains in its original package in an in-state warehouse for the purpose of shipment, without further processing, to an out-of-state destination[.]
 IND.CODE § 6–1.1–10–29(b)(1).

4. Indiana Code § 6–1.1–10–30 provides:
 (a) Subject to the limitation contained in subsection (d) of this section, personal property is exempt from taxation if:
 (1) the property is owned by a nonresident of this state;
 (2) the owner is able to show by adequate records that the property has been shipped into this state and placed in its original package in a public or private warehouse for the purpose of transshipment to an out-of-state destination; and
 (3) the property remains in its original package and in the public or private warehouse.
 For purposes of this subsection, a nonresident is a taxpayer who places goods in the original package and into the stream of commerce from outside the state of Indiana.
 (b) Subject to the limitation contained in subsection (d) of this section, personal property is exempt from taxation if:
 (1) the property has been placed in its original package in a public or private warehouse for the purpose of shipment to an out-of-state destination;
 (2) the property remains in the original package and in the public or private warehouse; and

 (3) the property had been ordered and is ready for shipment in interstate commerce to a specific known destination to which the property is subsequently shipped.
 If a property tax exemption is claimed under this subsection for property which is not shipped to a specific known destination as required under subdivision (3), the taxpayer shall file an amended personal property tax return for the year for which the exemption for that property was claimed.
 (c) Subject to the limitation contained in subsection (d) of this section, personal property is exempt from property taxation if:
 (1) the property has been placed in its original package in a public warehouse;
 (2) the property was transported to that public warehouse by a common, contract, or private carrier;
 (3) the owner is able to show by adequate records that the property is held in the public warehouse for purposes of transshipment to an out-of-state destination and is labeled to show that purpose; and
 (4) the property remains in its original package and in the public warehouse.
 However, no personal property is exempt from property taxation under this subsection if the property is owned by the same person who owns or leases the public warehouse where the property is held.
 (d) An exemption provided by this section applies only to the extent that the property is exempt from taxation under the commerce clause of the Constitution of the United States.
 IND.CODE § 6–1.1–10–30.

*sic Entertainment, Inc. v. State Bd. of Tax Comm'rs,* 681 N.E.2d 800, 803 (Ind. Tax Ct.1997). Indeed, as this Court previously explained:

> Where the goods are shipped into Indiana, the taxpayer may still enjoy an exemption for its property if it does no more than "repackage" the goods for transshipment out of state. Against the background of the "original package" exemptions, the term "repackage" clearly refers, not to packaging in the sense of combining different parts or components of a product for sale, but to repackaging in the sense of transferring to a different container for the purpose of transshipment. This is the meaning given in Webster's second definition of the verb "package": "to enclose in a package or protective covering ... to put (a commodity) into a protective wrapper or container for shipment or storage." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY[ ] 1618 (1981). This is the meaning intended by the legislature.

*Id.* (footnote deleted).

Case law also supports this reading of the statute. In *Monarch Steel,* this Court explained that securing an interstate commerce exemption most often hinges on the distinction between "manufacturing or processing" on the one hand and "packaging" or "repackaging" on the other. *Monarch Steel,* 611 N.E.2d at 713–714. In that case, the taxpayer, engaged in the business of buying and selling large quantities of steel, was claiming an interstate commerce exemption for its inventory. *Id.* at 710. In some instances, Monarch made no changes to the steel before shipping it out of state. *Id.* In other instances, it cut the steel into smaller pieces to facilitate shipment. *Id.* In still other instances, it cut the steel pursuant to customer specifications. *Id.* This Court held that "the question turns on whether Monarch cut[ ] a piece of steel to prepare a product to sell to a customer, or to prepare an already completed product for shipment or storage," *id.* at 714, explaining:

> [u]nder the interstate commerce exemptions, processing is concerned with the alteration of an article's state or form. Packaging, on the other hand, is concerned with transit and storage. Processing, then, refers to the preparation of a final saleable product, while packaging presumes a final saleable product already exists, and all that remains is to prepare it for shipping or storage.

*Id.* (citations and footnotes omitted). On the facts presented, the Court held that Monarch "processed" the steel when it cut the steel "to satisfy a customer's order, that is, to create a final saleable product," but that Monarch "packaged" the steel when it cut the steel "simply and solely to facilitate shipment or storage[.]" *Id.*

In applying the *Sony/Monarch Steel* standard to the facts of this case, Edgcomb did nothing more than repackage its steel to facilitate storage and shipment. As Edgcomb explains:

> [We] purchase[ ] sheet steel from mills in bulk, which is shipped to [us] in an "original package" consisting of a coil encircled by a band. [We] unpackage[ ] the sheet steel by unwinding it from the coil and leveling it. After it is leveled it is identical in form and composition to its form and composition at the mill....

> [We] then cut[ ] the sheet steel into manageable, standard sized sheets for ease of storage and shipment and store[ ] the sheets on shelving until they are pulled, packaged, and shipped. The cutting, of course, is no different in purpose or effect than any distribution center's activity in breaking down product received in bulk into smaller quantities for purposes of shipment to customers.

[We] do[ ] not "combine" the sheet steel with other property as a component to make a different "final saleable product." The sheet steel is [the] commodity, which is not changed in form or substance . . . in any way other than cut into standard sized sheets for ease of storage and shipment. It is not cut to customer specifications, it is placed in open inventory. When ordered, it is pulled, put into a new package, and shipped to the customer.

(Pet'r Br. at 15–16, footnote omitted.) In other words, Edgcomb cuts the steel into standard-sized pieces to facilitate storage and handling.

Nevertheless, the State Board argues otherwise. First, it contends that Edgcomb's leveling of the steel alters the steel's form. Second, the State Board argues that a "standard cut" piece of steel, in and of itself, constitutes a final saleable product. Specifically, the State Board argues:

> Edgcomb makes products that its customers will buy, regardless of whether it makes the product for a special, specific customer order, or it makes standard products in anticipation of what customers will order in the future. To make its products, Edgcomb changes the form of the material. It is not merely breaking large quantities into small quantities. Both the Custom Cut Steel and the Standard Cut Steel must be leveled and cut in order to be prepared for market or to be rendered in a condition for sale. This process of leveling and cutting is done in order to produce a product in a condition required by customers.

(Resp't Br. at 11.) The State Board's argument is nothing more than smoke and mirrors.

■ First, when Edgcomb purchases sheet steel from the mills, the sheets are approximately 100 feet long. Too cumbersome to transport in that fashion, the mills wrap the sheet steel on large coils and fasten with metal bands. These coils constitute the "original packages." Edgcomb's process of rolling the steel off the coil and through the leveler is the equivalent of *unpacking* the steel from its original package. *See Monarch Steel,* 611 N.E.2d at 714. Cutting the steel in basic "standard cut" pieces is nothing more than breaking large quantities into small quantities—*repackaging. Id.* This repackaging is not done pursuant to customer specifications or request, but merely to increase storage capacity in Edgcomb's warehouse as well as to allow easier shipping and handling. Indeed, pieces of flat sheet steel require less floor space than steel wrapped on huge coils.

Second, the State Board's claim that the "standard cut" piece of steel constitutes a final saleable product misses the mark. The sheet steel is the final saleable product. It has always been the final saleable product. It just happens that some customers are able to utilize pieces of "standard cut" steel for their purposes when they place their orders. It was no different in the *Monarch* case.

### Conclusion

Based on the foregoing, the Court finds that Edgcomb does nothing more than repackage its sheet steel when it cuts "standard cut" pieces. Consequently, Edgcomb's "standard cut" pieces of steel are exempt from taxation under Indiana Code § 6–1.1–10–29.3. This Court REVERSES the State Board's final determinations and the case is REMANDED to the Indiana Board[5] with instructions to

---

**5.** All cases that would have previously been remanded to the State Board will now be remanded to the Indiana Board. IND CODE § 6–1.1–15–8. Final determinations made by

grant the exemption on Edgcomb's "standard cut" steel pieces.

the Indiana Board are subject to review by this Court pursuant to Indiana Code § 6–1.1–

15. IND.CODE §§ 6–1.5–5–7; 33–3–5–2.